# CITY OF RENTON ET AL. *v.* PLAYTIME THEATRES, INC., ET AL.

No. 84–1360.   Argued November 12, 1985—Decided February 25, 1986

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, STEVENS, and O'CONNOR, JJ., joined. BLACKMUN, J., concurred in the result. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 55.

*E. Barrett Prettyman, Jr.,* argued the cause for appellants. With him on the briefs were *David W. Burgett, Lawrence J. Warren, Daniel Kellogg, Mark E. Barber,* and *Zanetta L. Fontes.*

*Jack R. Burns* argued the cause for appellees. With him on the briefs was *Robert E. Smith.**

---

*Briefs of *amici curiae* urging reversal were filed for Jackson County, Missouri, by *Russell D. Jacobson;* for the Freedom Council Foundation by *Wendell R. Bird* and *Robert K. Skolrood;* for the National Institute of Municipal Law Officers by *George Agnost, Roy D. Bates, Benjamin L. Brown, J. Lamar Shelley, John W. Witt, Roger F. Cutler, Robert J. Alfton, James K. Baker, Barbara Mather, James D. Montgomery, Clifford D. Pierce, Jr., William H. Taube, William I. Thornton, Jr.,* and *Charles S. Rhyne;* and for the National League of Cities et al. by *Benna*

JUSTICE REHNQUIST delivered the opinion of the Court.

This case involves a constitutional challenge to a zoning ordinance, enacted by appellant city of Renton, Washington, that prohibits adult motion picture theaters from locating within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. Appellees, Playtime Theatres, Inc., and Sea-First Properties, Inc., filed an action in the United States District Court for the Western District of Washington seeking a declaratory judgment that the Renton ordinance violated the First and Fourteenth Amendments and a permanent injunction against its enforcement. The District Court ruled in favor of Renton and denied the permanent injunction, but the Court of Appeals for the Ninth Circuit reversed and remanded for reconsideration. 748 F. 2d 527 (1984). We noted probable jurisdiction, 471 U. S. 1013 (1985), and now reverse the judgment of the Ninth Circuit.[1]

---

*Ruth Solomon, Joyce Holmes Benjamin, Beate Bloch,* and *Lawrence R. Velvel.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *David Utevsky, Jack D. Novik,* and *Burt Neuborne;* and for the American Booksellers Association, Inc., et al. by *Michael A. Bamberger.*

*Eric M. Rubin* and *Walter E. Diercks* filed a brief for the Outdoor Advertising Association of America, Inc., et al. as *amici curiae.*

[1] This appeal was taken under 28 U. S. C. § 1254(2), which provides this Court with appellate jurisdiction at the behest of a party relying on a state statute or local ordinance held unconstitutional by a court of appeals. As we have previously noted, there is some question whether jurisdiction under § 1254(2) is available to review a nonfinal judgment. See *South Carolina Electric & Gas Co.* v. *Flemming,* 351 U. S. 901 (1956); *Slaker* v. *O'Connor,* 278 U. S. 188 (1929). But see *Chicago* v. *Atchison, T. & S. F. R. Co.,* 357 U. S. 77, 82–83 (1958).

The present appeal seeks review of a judgment remanding the case to the District Court. We need not resolve whether this appeal is proper under § 1254(2), however, because in any event we have certiorari jurisdiction under 28 U. S. C. § 2103. As we have previously done in equiva-

In May 1980, the Mayor of Renton, a city of approximately 32,000 people located just south of Seattle, suggested to the Renton City Council that it consider the advisability of enacting zoning legislation dealing with adult entertainment uses. No such uses existed in the city at that time. Upon the Mayor's suggestion, the City Council referred the matter to the city's Planning and Development Committee. The Committee held public hearings, reviewed the experiences of Seattle and other cities, and received a report from the City Attorney's Office advising as to developments in other cities. The City Council, meanwhile, adopted Resolution No. 2368, which imposed a moratorium on the licensing of "any business . . . which . . . has as its primary purpose the selling, renting or showing of sexually explicit materials." App. 43. The resolution contained a clause explaining that such businesses "would have a severe impact upon surrounding businesses and residences." *Id.*, at 42.

In April 1981, acting on the basis of the Planning and Development Committee's recommendation, the City Council enacted Ordinance No. 3526. The ordinance prohibited any "adult motion picture theater" from locating within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, or park, and within one mile of any school. App. to Juris. Statement 79a. The term "adult motion picture theater" was defined as "[a]n enclosed building used for presenting motion picture films, video cassettes, cable television, or any other such visual media, distinguished or characteri[zed] by an emphasis on matter depicting, describing or relating to 'specified sexual activities' or 'specified anatomical areas' . . . for observation by patrons therein." *Id.*, at 78a.

---

lent situations, see *El Paso* v. *Simmons*, 379 U. S. 497, 502–503 (1965); *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 927 (1975), we dismiss the appeal and, treating the papers as a petition for certiorari, grant the writ of certiorari. Henceforth, we shall refer to the parties as "petitioners" and "respondents."

In early 1982, respondents acquired two existing theaters in downtown Renton, with the intention of using them to exhibit feature-length adult films. The theaters were located within the area proscribed by Ordinance No. 3526. At about the same time, respondents filed the previously mentioned lawsuit challenging the ordinance on First and Fourteenth Amendment grounds, and seeking declaratory and injunctive relief. While the federal action was pending, the City Council amended the ordinance in several respects, adding a statement of reasons for its enactment and reducing the minimum distance from any school to 1,000 feet.

In November 1982, the Federal Magistrate to whom respondents' action had been referred recommended the entry of a preliminary injunction against enforcement of the Renton ordinance and the denial of Renton's motions to dismiss and for summary judgment. The District Court adopted the Magistrate's recommendations and entered the preliminary injunction, and respondents began showing adult films at their two theaters in Renton. Shortly thereafter, the parties agreed to submit the case for a final decision on whether a permanent injunction should issue on the basis of the record as already developed.

The District Court then vacated the preliminary injunction, denied respondents' requested permanent injunction, and entered summary judgment in favor of Renton. The court found that the Renton ordinance did not substantially restrict First Amendment interests, that Renton was not required to show specific adverse impact on Renton from the operation of adult theaters but could rely on the experiences of other cities, that the purposes of the ordinance were unrelated to the suppression of speech, and that the restrictions on speech imposed by the ordinance were no greater than necessary to further the governmental interests involved. Relying on *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976), and *United States* v. *O'Brien*, 391 U. S. 367 (1968), the court held that the Renton ordinance did not violate the First Amendment.

The Court of Appeals for the Ninth Circuit reversed. The Court of Appeals first concluded, contrary to the finding of the District Court, that the Renton ordinance constituted a substantial restriction on First Amendment interests. Then, using the standards set forth in *United States* v. *O'Brien, supra,* the Court of Appeals held that Renton had improperly relied on the experiences of other cities in lieu of evidence about the effects of adult theaters on Renton, that Renton had thus failed to establish adequately the existence of a substantial governmental interest in support of its ordinance, and that in any event Renton's asserted interests had not been shown to be unrelated to the suppression of expression. The Court of Appeals remanded the case to the District Court for reconsideration of Renton's asserted interests.

In our view, the resolution of this case is largely dictated by our decision in *Young* v. *American Mini Theatres, Inc., supra.* There, although five Members of the Court did not agree on a single rationale for the decision, we held that the city of Detroit's zoning ordinance, which prohibited locating an adult theater within 1,000 feet of any two other "regulated uses" or within 500 feet of any residential zone, did not violate the First and Fourteenth Amendments. *Id.,* at 72–73 (plurality opinion of STEVENS, J., joined by BURGER, C. J., and WHITE and REHNQUIST, JJ.); *id.,* at 84 (POWELL, J., concurring). The Renton ordinance, like the one in *American Mini Theatres,* does not ban adult theaters altogether, but merely provides that such theaters may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. The ordinance is therefore properly analyzed as a form of time, place, and manner regulation. *Id.,* at 63, and n. 18; *id.,* at 78–79 (POWELL, J., concurring).

Describing the ordinance as a time, place, and manner regulation is, of course, only the first step in our inquiry. This Court has long held that regulations enacted for the

purpose of restraining speech on the basis of its content presumptively violate the First Amendment. See *Carey* v. *Brown*, 447 U. S. 455, 462–463, and n. 7 (1980); *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95, 98–99 (1972). On the other hand, so-called "content-neutral" time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication. See *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984); *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 807 (1984); *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 647–648 (1981).

At first glance, the Renton ordinance, like the ordinance in *American Mini Theatres*, does not appear to fit neatly into either the "content-based" or the "content-neutral" category. To be sure, the ordinance treats theaters that specialize in adult films differently from other kinds of theaters. Nevertheless, as the District Court concluded, the Renton ordinance is aimed not at the *content* of the films shown at "adult motion picture theatres," but rather at the *secondary effects* of such theaters on the surrounding community. The District Court found that the City Council's *"predominate* concerns" were with the secondary effects of adult theaters, and not with the content of adult films themselves. App. to Juris. Statement 31a (emphasis added). But the Court of Appeals, relying on its decision in *Tovar* v. *Billmeyer*, 721 F. 2d 1260, 1266 (CA9 1983), held that this was not enough to sustain the ordinance. According to the Court of Appeals, if *"a motivating factor"* in enacting the ordinance was to restrict respondents' exercise of First Amendment rights the ordinance would be invalid, apparently no matter how small a part this motivating factor may have played in the City Council's decision. 748 F. 2d, at 537 (emphasis in original). This view of the law was rejected in *United States* v. *O'Brien*, 391 U. S., at 382–386, the very case that the Court of Appeals said it was applying:

"It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. . . .

. . . . . . . . . .

". . . What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *Id.*, at 383–384.

The District Court's finding as to "predominate" intent, left undisturbed by the Court of Appeals, is more than adequate to establish that the city's pursuit of its zoning interests here was unrelated to the suppression of free expression. The ordinance by its terms is designed to prevent crime, protect the city's retail trade, maintain property values, and generally "protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life," not to suppress the expression of unpopular views. See App. to Juris. Statement 90a. As JUSTICE POWELL observed in *American Mini Theatres*, "[i]f [the city] had been concerned with restricting the message purveyed by adult theaters, it would have tried to close them or restrict their number rather than circumscribe their choice as to location." 427 U. S., at 82, n. 4.

In short, the Renton ordinance is completely consistent with our definition of "content-neutral" speech regulations as those that "are *justified* without reference to the content of the regulated speech." *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976) (emphasis added); *Community for Creative Non-Violence, supra*, at 293; *International Society for Krishna Consciousness, supra*, at 648. The ordinance does not contravene the fundamental principle that underlies our concern about "content-based" speech regulations: that "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express

less favored or more controversial views." *Mosley, supra,* at 95–96.

It was with this understanding in mind that, in *American Mini Theatres,* a majority of this Court decided that, at least with respect to businesses that purvey sexually explicit materials,[2] zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standards applicable to "content-neutral" time, place, and manner regulations. JUSTICE STEVENS, writing for the plurality, concluded that the city of Detroit was entitled to draw a distinction between adult theaters and other kinds of theaters "without violating the government's paramount obligation of neutrality in its regulation of protected communication," 427 U. S., at 70, noting that "[i]t is th[e] secondary effect which these zoning ordinances attempt to avoid, not the dissemination of 'offensive' speech," *id.,* at 71, n. 34. JUSTICE POWELL, in concurrence, elaborated:

> "[The] dissent misconceives the issue in this case by insisting that it involves an impermissible time, place, and manner restriction based on the content of expression. It involves nothing of the kind. We have here merely a decision by the city to treat certain movie theaters differently because they have markedly different effects upon their surroundings. . . . Moreover, even if this were a case involving a special governmental response to the content of one type of movie, it is possible that the result would be supported by a line of cases recognizing that the government can tailor its reaction to different types of speech according to the degree to which its special and overriding interests are implicated.

---

[2] See *American Mini Theatres,* 427 U. S., at 70 (plurality opinion) ("[I]t is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate . . .").

See, *e. g., Tinker* v. *Des Moines School Dist.*, 393 U. S. 503, 509–511 (1969); *Procunier* v. *Martinez*, 416 U. S. 396, 413–414 (1974); *Greer* v. *Spock*, 424 U. S. 828, 842–844 (1976) (POWELL, J., concurring); cf. *CSC* v. *Letter Carriers*, 413 U. S. 548 (1973)." *Id.*, at 82, n. 6.

The appropriate inquiry in this case, then, is whether the Renton ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication. See *Community for Creative Non-Violence*, 468 U. S., at 293; *International Society for Krishna Consciousness*, 452 U. S., at 649, 654. It is clear that the ordinance meets such a standard. As a majority of this Court recognized in *American Mini Theatres*, a city's "interest in attempting to preserve the quality of urban life is one that must be accorded high respect." 427 U. S., at 71 (plurality opinion); see *id.*, at 80 (POWELL, J., concurring) ("Nor is there doubt that the interests furthered by this ordinance are both important and substantial"). Exactly the same vital governmental interests are at stake here.

The Court of Appeals ruled, however, that because the Renton ordinance was enacted without the benefit of studies specifically relating to "the particular problems or needs of Renton," the city's justifications for the ordinance were "conclusory and speculative." 748 F. 2d, at 537. We think the Court of Appeals imposed on the city an unnecessarily rigid burden of proof. The record in this case reveals that Renton relied heavily on the experience of, and studies produced by, the city of Seattle. In Seattle, as in Renton, the adult theater zoning ordinance was aimed at preventing the secondary effects caused by the presence of even one such theater in a given neighborhood. See *Northend Cinema, Inc.* v. *Seattle*, 90 Wash. 2d 709, 585 P. 2d 1153 (1978). The opinion of the Supreme Court of Washington in *Northend Cinema*, which

was before the Renton City Council when it enacted the ordinance in question here, described Seattle's experience as follows:

"The amendments to the City's zoning code which are at issue here are the culmination of a long period of study and discussion of the problems of adult movie theaters in residential areas of the City. . . . [T]he City's Department of Community Development made a study of the need for zoning controls of adult theaters . . . . The study analyzed the City's zoning scheme, comprehensive plan, and land uses around existing adult motion picture theaters. . . ." *Id.*, at 711, 585 P. 2d, at 1155.

"[T]he [trial] court heard extensive testimony regarding the history and purpose of these ordinances. It heard expert testimony on the adverse effects of the presence of adult motion picture theaters on neighborhood children and community improvement efforts. The court's detailed findings, which include a finding that the location of adult theaters has a harmful effect on the area and contribute to neighborhood blight, are supported by substantial evidence in the record." *Id.*, at 713, 585 P. 2d, at 1156.

"The record is replete with testimony regarding the effects of adult movie theater locations on residential neighborhoods." *Id.*, at 719, 585 P. 2d, at 1159.

We hold that Renton was entitled to rely on the experiences of Seattle and other cities, and in particular on the "detailed findings" summarized in the Washington Supreme Court's *Northend Cinema* opinion, in enacting its adult theater zoning ordinance. The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the

problem that the city addresses. That was the case here. Nor is our holding affected by the fact that Seattle ultimately chose a different method of adult theater zoning than that chosen by Renton, since Seattle's choice of a different remedy to combat the secondary effects of adult theaters does not call into question either Seattle's identification of those secondary effects or the relevance of Seattle's experience to Renton.

We also find no constitutional defect in the method chosen by Renton to further its substantial interests. Cities may regulate adult theaters by dispersing them, as in Detroit, or by effectively concentrating them, as in Renton. "It is not our function to appraise the wisdom of [the city's] decision to require adult theaters to be separated rather than concentrated in the same areas. . . . [T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *American Mini Theatres*, 427 U. S., at 71 (plurality opinion). Moreover, the Renton ordinance is "narrowly tailored" to affect only that category of theaters shown to produce the unwanted secondary effects, thus avoiding the flaw that proved fatal to the regulations in *Schad* v. *Mount Ephraim*, 452 U. S. 61 (1981), and *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205 (1975).

Respondents contend that the Renton ordinance is "underinclusive," in that it fails to regulate other kinds of adult businesses that are likely to produce secondary effects similar to those produced by adult theaters. On this record the contention must fail. There is no evidence that, at the time the Renton ordinance was enacted, any other adult business was located in, or was contemplating moving into, Renton. In fact, Resolution No. 2368, enacted in October 1980, states that "the City of Renton does not, at the present time, have any business whose primary purpose is the sale, rental, or showing of sexually explicit materials." App. 42. That Renton chose first to address the potential problems created

by one particular kind of adult business in no way suggests that the city has "singled out" adult theaters for discriminatory treatment. We simply have no basis on this record for assuming that Renton will not, in the future, amend its ordinance to include other kinds of adult businesses that have been shown to produce the same kinds of secondary effects as adult theaters. See *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 488–489 (1955).

Finally, turning to the question whether the Renton ordinance allows for reasonable alternative avenues of communication, we note that the ordinance leaves some 520 acres, or more than five percent of the entire land area of Renton, open to use as adult theater sites. The District Court found, and the Court of Appeals did not dispute the finding, that the 520 acres of land consists of "[a]mple, accessible real estate," including "acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that is criss-crossed by freeways, highways, and roads." App. to Juris. Statement 28a.

Respondents argue, however, that some of the land in question is already occupied by existing businesses, that "practically none" of the undeveloped land is currently for sale or lease, and that in general there are no "commercially viable" adult theater sites within the 520 acres left open by the Renton ordinance. Brief for Appellees 34–37. The Court of Appeals accepted these arguments,[3] concluded that

---

[3] The Court of Appeals' rejection of the District Court's findings on this issue may have stemmed in part from the belief, expressed elsewhere in the Court of Appeals' opinion, that, under *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485 (1984), appellate courts have a duty to review *de novo* all mixed findings of law and fact relevant to the application of First Amendment principles. See 748 F. 2d 527, 535 (1984). We need not review the correctness of the Court of Appeals' interpretation of *Bose Corp.*, since we determine that, under any standard of review, the District Court's findings should not have been disturbed.

the 520 acres was not truly "available" land, and therefore held that the Renton ordinance "would result in a substantial restriction" on speech. 748 F. 2d, at 534.

We disagree with both the reasoning and the conclusion of the Court of Appeals. That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have "the effect of suppressing, or greatly restricting access to, lawful speech," *American Mini Theatres*, 427 U. S., at 71, n. 35 (plurality opinion), we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices. See *id.*, at 78 (POWELL, J., concurring) ("The inquiry for First Amendment purposes is not concerned with economic impact"). In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance before us easily meets this requirement.

In sum, we find that the Renton ordinance represents a valid governmental response to the "admittedly serious problems" created by adult theaters. See *id.*, at 71 (plurality opinion). Renton has not used "the power to zone as a pretext for suppressing expression," *id.*, at 84 (POWELL, J., concurring), but rather has sought to make some areas available for adult theaters and their patrons, while at the same time preserving the quality of life in the community at large by preventing those theaters from locating in other areas. This, after all, is the essence of zoning. Here, as in *American Mini Theatres*, the city has enacted a zoning ordinance that meets these goals while also satisfying the dictates of the

First Amendment.[4]   The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE BLACKMUN concurs in the result.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Renton's zoning ordinance selectively imposes limitations on the location of a movie theater based exclusively on the content of the films shown there.   The constitutionality of the ordinance is therefore not correctly analyzed under standards applied to content-neutral time, place, and manner restrictions.   But even assuming that the ordinance may fairly be characterized as content neutral, it is plainly unconstitutional under the standards established by the decisions of this Court.   Although the Court's analysis is limited to

---

[4] Respondents argue, as an "alternative basis" for affirming the decision of the Court of Appeals, that the Renton ordinance violates their rights under the Equal Protection Clause of the Fourteenth Amendment.   As should be apparent from our preceding discussion, respondents can fare no better under the Equal Protection Clause than under the First Amendment itself.   See *Young* v. *American Mini Theatres, Inc.,* 427 U. S., at 63–73.

Respondents also argue that the Renton ordinance is unconstitutionally vague.   More particularly, respondents challenge the ordinance's application to buildings "used" for presenting sexually explicit films, where the term "used" describes "a continuing course of conduct of exhibiting [sexually explicit films] in a manner which appeals to a prurient interest."   App. to Juris. Statement 96a.   We reject respondents' "vagueness" argument for the same reasons that led us to reject a similar challenge in *American Mini Theatres, supra.*   There, the Detroit ordinance applied to theaters "used to present material distinguished or characterized by an emphasis on [sexually explicit matter]."   *Id.,* at 53.   We held that "even if there may be some uncertainty about the effect of the ordinances on other litigants, they are unquestionably applicable to these respondents."   *Id.,* at 58–59.   We also held that the Detroit ordinance created no "significant deterrent effect" that might justify invocation of the First Amendment "overbreadth" doctrine.   *Id.,* at 59–61.

cases involving "businesses that purvey sexually explicit materials," *ante*, at 49, and n. 2, and thus does not affect our holdings in cases involving state regulation of other kinds of speech, I dissent.

## I

"[A] constitutionally permissible time, place, or manner restriction may not be based upon either the content or subject matter of speech." *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 536 (1980). The Court asserts that the ordinance is "aimed not at the *content* of the films shown at 'adult motion picture theatres,' but rather at the *secondary effects* of such theaters on the surrounding community," *ante*, at 47 (emphasis in original), and thus is simply a time, place, and manner regulation.[1] This analysis is misguided.

The fact that adult movie theaters may cause harmful "secondary" land-use effects may arguably give Renton a compelling reason to regulate such establishments; it does not mean, however, that such regulations are content neutral.

---

[1] The Court apparently finds comfort in the fact that the ordinance does not "deny use to those wishing to express less favored or more controversial views." *Ante*, at 48–49. However, content-based discrimination is not rendered "any less odious" because it distinguishes "among entire classes of ideas, rather than among points of view within a particular class." *Lehman* v. *City of Shaker Heights*, 418 U. S. 298, 316 (1974) (BRENNAN, J., dissenting); see also *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 537 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic"). Moreover, the Court's conclusion that the restrictions imposed here were viewpoint neutral is patently flawed. "As a practical matter, the speech suppressed by restrictions such as those involved [here] will almost invariably carry an implicit, if not explicit, message in favor of more relaxed sexual mores. Such restrictions, in other words, have a potent viewpoint-differential impact. . . . To treat such restrictions as viewpoint-neutral seems simply to ignore reality." Stone, Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions, 46 U. Chi. L. Rev. 81, 111–112 (1978).

Because the ordinance imposes special restrictions on certain kinds of speech on the basis of *content*, I cannot simply accept, as the Court does, Renton's claim that the ordinance was not designed to suppress the content of adult movies. "[W]hen regulation is based on the content of speech, governmental action must be scrutinized more carefully to ensure that communication has not been prohibited 'merely because public officials disapprove the speaker's views.'" *Consolidated Edison Co., supra,* at 536 (quoting *Niemotko* v. *Maryland,* 340 U. S. 268, 282 (1951) (Frankfurter, J., concurring in result)). "[B]efore deferring to [Renton's] judgment, [we] must be convinced that the city is seriously and comprehensively addressing" secondary land-use effects associated with adult movie theaters. *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 531 (1981) (BRENNAN, J., concurring in judgment). In this case, both the language of the ordinance and its dubious legislative history belie the Court's conclusion that "the city's pursuit of its zoning interests here was unrelated to the suppression of free expression." *Ante,* at 48.

## A

The ordinance discriminates on its face against certain forms of speech based on content. Movie theaters specializing in "adult motion pictures" may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. Other motion picture theaters, and other forms of "adult entertainment," such as bars, massage parlors, and adult bookstores, are not subject to the same restrictions. This selective treatment strongly suggests that Renton was interested not in controlling the "secondary effects" associated with adult businesses, but in discriminating against adult theaters based on the content of the films they exhibit. The Court ignores this discriminatory treatment, declaring that Renton is free "to address the potential problems created by one particular kind of adult business," *ante,* at 52–53, and to amend the ordinance in the

future to include other adult enterprises. *Ante,* at 53 (citing *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 488–489 (1955)).[2] However, because of the First Amendment interests at stake here, this one-step-at-a-time analysis is wholly inappropriate.

> "This Court frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it. See *e. g., Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 488–489 (1955). This presumption of statutory validity, however, has less force when a classification turns on the subject matter of expression. '[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' *Police Dept. of Chicago* v. *Mosley,* 408 U. S., at 95." *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 215 (1975).

In this case, the city has not justified treating adult movie theaters differently from other adult entertainment businesses. The ordinance's underinclusiveness is cogent evidence that it was aimed at the *content* of the films shown in adult movie theaters.

### B

Shortly *after* this lawsuit commenced, the Renton City Council amended the ordinance, adding a provision explaining that its intention in adopting the ordinance had been "to promote the City of Renton's great interest in protecting and preserving the quality of its neighborhoods, commercial districts, and the quality of urban life through effective land

---

[2] The Court also explains that "[t]here is no evidence that, at the time the Renton ordinance was enacted, any other adult business was located in, or was contemplating moving into, Renton." *Ante,* at 52. However, at the time the ordinance was enacted, there was no evidence that any *adult movie theaters* were located in, or considering moving to, Renton. Thus, there was no legitimate reason for the city to treat adult movie theaters differently from other adult businesses.

use planning." App. to Juris. Statement 81a. The amended ordinance also lists certain conclusory "findings" concerning adult entertainment land uses that the Council purportedly relied upon in adopting the ordinance. *Id.*, at 81a–86a. The city points to these provisions as evidence that the ordinance was designed to control the secondary effects associated with adult movie theaters, rather than to suppress the content of the films they exhibit. However, the "legislative history" of the ordinance strongly suggests otherwise.

Prior to the amendment, there was no indication that the ordinance was designed to address any "secondary effects" a single adult theater might create. In addition to the suspiciously coincidental timing of the amendment, many of the City Council's "findings" do not relate to legitimate land-use concerns. As the Court of Appeals observed, "[b]oth the magistrate and the district court recognized that many of the stated reasons for the ordinance were no more than expressions of dislike for the subject matter." 748 F. 2d 527, 537 (CA9 1984).[3] That some residents may be offended by the *content* of the films shown at adult movie theaters cannot form the basis for state regulation of speech. See *Terminiello* v. *Chicago*, 337 U. S. 1 (1949).

Some of the "findings" added by the City Council do relate to supposed "secondary effects" associated with adult movie

---

[3] For example, "finding" number 2 states that

"[l]ocation of adult entertainment land uses on the main commercial thoroughfares of the City gives an impression of legitimacy to, and causes a loss of sensitivity to the adverse effect of pornography upon children, established family relations, respect for marital relationship and for the sanctity of marriage relations of others, and the concept of non-aggressive, consensual sexual relations." App. to Juris. Statement 86a.

"Finding" number 6 states that

"[l]ocation of adult land uses in close proximity to residential uses, churches, parks, and other public facilities, and schools, will cause a degradation of the community standard of morality. Pornographic material has a degrading effect upon the relationship between spouses." *Ibid.*

theaters.[4]    However, the Court cannot, as it does, merely accept these *post hoc* statements at face value.    "[T]he presumption of validity that traditionally attends a local government's exercise of its zoning powers carries little, if any, weight where the zoning regulation trenches on rights of expression protected under the First Amendment." *Schad* v. *Mount Ephraim*, 452 U. S. 61, 77 (1981) (BLACKMUN, J., concurring).    As the Court of Appeals concluded, "[t]he record presented by Renton to support its asserted interest in enacting the zoning ordinance is very thin."    748 F. 2d, at 536.

The amended ordinance states that its "findings" summarize testimony received by the City Council at certain public hearings.    While none of this testimony was ever recorded or preserved, a city official reported that residents had objected to having adult movie theaters located in their community.    However, the official was unable to recount any testimony as to how adult movie theaters would specifically affect the schools, churches, parks, or residences "protected" by the ordinance.    See App. 190–192.    The City Council conducted no studies, and heard no expert testimony, on how the protected uses would be affected by the presence of an adult movie theater, and never considered whether residents' concerns could be met by "restrictions that are less intrusive on protected forms of expression." *Schad, supra,* at 74. As a result, any "findings" regarding "secondary effects" caused by adult movie theaters, or the need to adopt specific locational requirements to combat such effects, were not "findings" at all, but purely speculative conclusions.    Such "findings" were not such as are required to justify the bur-

---

[4] For example, "finding" number 12 states that

"[l]ocation of adult entertainment land uses in proximity to residential uses, churches, parks and other public facilities, and schools, may lead to increased levels of criminal activities, including prostitution, rape, incest and assaults in the vicinity of such adult entertainment land uses." *Id.,* at 83a.

dens the ordinance imposed upon constitutionally protected expression.

The Court holds that Renton was entitled to rely on the experiences of cities like Detroit and Seattle, which had enacted special zoning regulations for adult entertainment businesses after studying the adverse effects caused by such establishments. However, even assuming that Renton was concerned with the same problems as Seattle and Detroit, it never actually reviewed any of the studies conducted by those cities. Renton had no basis for determining if any of the "findings" made by these cities were relevant to *Renton's* problems or needs.[5] Moreover, since Renton ultimately adopted zoning regulations different from either Detroit or Seattle, these "studies" provide no basis for assessing the effectiveness of the particular restrictions adopted under the ordinance.[6] Renton cannot merely rely on the general ex-

---

[5] As part of the amendment passed after this lawsuit commenced, the City Council added a statement that it had intended to rely on the Washington Supreme Court's opinion in *Northend Cinema, Inc.* v. *Seattle,* 90 Wash. 2d 709, 585 P. 2d 1153 (1978), cert. denied *sub nom. Apple Theatre, Inc.* v. *Seattle,* 441 U. S. 946 (1979), which upheld Seattle's zoning regulations against constitutional attack. Again, despite the suspicious coincidental timing of the amendment, the Court holds that "Renton was entitled to rely . . . on the 'detailed findings' summarized in the . . . *Northend Cinema* opinion." *Ante,* at 51. In *Northend Cinema,* the court noted that "[t]he record is replete with testimony regarding the effects of adult movie theater locations on residential neighborhoods." 90 Wash. 2d, at 719, 585 P. 2d, at 1159. The opinion however, does not explain the evidence it purports to summarize, and provides no basis for determining whether Seattle's experience is relevant to Renton's.

[6] As the Court of Appeals observed:

"Although the Renton ordinance *purports* to copy Detroit's and Seattle's, it does not solve the same problem in the same manner. The Detroit ordinance was intended to disperse adult theaters throughout the city so that no one district would deteriorate due to a concentration of such theaters. The Seattle ordinance, by contrast, was intended to *concentrate* the theaters in one place so that the whole city would not bear the effects of them. The Renton Ordinance is allegedly aimed at protecting certain uses—schools, parks, churches and residential areas—from the perceived

periences of Seattle or Detroit, for it must "justify its ordinance in the context of *Renton's* problems—not Seattle's or Detroit's problems." 748 F. 2d, at 536 (emphasis in original).

In sum, the circumstances here strongly suggest that the ordinance was designed to suppress expression, even that constitutionally protected, and thus was not to be analyzed as a content-neutral time, place, and manner restriction. The Court allows Renton to conceal its illicit motives, however, by reliance on the fact that other communities adopted similar restrictions. The Court's approach largely immunizes such measures from judicial scrutiny, since a municipality can readily find other municipal ordinances to rely upon, thus always retrospectively justifying special zoning regulations for adult theaters.[7] Rather than speculate about Renton's motives for adopting such measures, our cases require the conclusion that the ordinance, like any other content-based restriction on speech, is constitutional "only if the [city] can show that [it] is a precisely drawn means of serving a compelling [governmental] interest." *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.,* 447 U. S., at 540; see also *Carey* v. *Brown,* 447 U. S. 455, 461–462 (1980); *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, 99 (1972). Only this strict approach can insure that cities will not use their zoning powers as a pretext for suppressing constitutionally protected expression.

---

unfavorable effects of an adult theater." 748 F. 2d, at 536 (emphasis in original).

[7] As one commentator has noted:

"[A]nyone with any knowledge of human nature should naturally assume that the decision to adopt almost any content-based restriction might have been affected by an antipathy on the part of at least some legislators to the ideas or information being suppressed. The logical assumption, in other words, is not that there is not improper motivation but, rather, because legislators are only human, that there is a substantial risk that an impermissible consideration has in fact colored the deliberative process." Stone, *supra* n. 1, at 106.

Applying this standard to the facts of this case, the ordinance is patently unconstitutional. Renton has not shown that locating adult movie theaters in proximity to its churches, schools, parks, and residences will necessarily result in undesirable "secondary effects," or that these problems could not be effectively addressed by less intrusive restrictions.

## II

Even assuming that the ordinance should be treated like a content-neutral time, place, and manner restriction, I would still find it unconstitutional. "[R]estrictions of this kind are valid provided . . . that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984); *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 648 (1981). In applying this standard, the Court "fails to subject the alleged interests of the [city] to the degree of scrutiny required to ensure that expressive activity protected by the First Amendment remains free of unnecessary limitations." *Community for Creative Non-Violence*, 468 U. S., at 301 (MARSHALL, J., dissenting). The Court "evidently [and wrongly] assumes that the balance struck by [Renton] officials is deserving of deference so long as it does not appear to be tainted by content discrimination." *Id.*, at 315. Under a *proper* application of the relevant standards, the ordinance is clearly unconstitutional.

## A

The Court finds that the ordinance was designed to further Renton's substantial interest in "preserv[ing] the quality of urban life." *Ante*, at 50. As explained above, the record here is simply insufficient to support this assertion. The city made no showing as to how uses "protected" by the ordinance would be affected by the presence of an adult movie theater. Thus, the Renton ordinance is clearly distinguishable from

the Detroit zoning ordinance upheld in *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976). The Detroit ordinance, which was designed to disperse adult theaters throughout the city, was supported by the testimony of urban planners and real estate experts regarding the adverse effects of locating several such businesses in the same neighborhood. *Id.*, at 55; see also *Northend Cinema, Inc.* v. *Seattle*, 90 Wash. 2d 709, 711, 585 P. 2d 1153, 1154–1155 (1978), cert. denied *sub nom. Apple Theatre, Inc.* v. *Seattle*, 441 U. S. 946 (1979) (Seattle zoning ordinance was the "culmination of a long period of study and discussion"). Here, the Renton Council was aware only that some residents had complained about adult movie theaters, and that other localities had adopted special zoning restrictions for such establishments. These are not "facts" sufficient to justify the burdens the ordinance imposed upon constitutionally protected expression.

### B

Finally, the ordinance is invalid because it does not provide for reasonable alternative avenues of communication. The District Court found that the ordinance left 520 acres in Renton available for adult theater sites, an area comprising about five percent of the city. However, the Court of Appeals found that because much of this land was already occupied, "[l]imiting adult theater uses to these areas is a substantial restriction on speech." 748 F. 2d, at 534. Many "available" sites are also largely unsuited for use by movie theaters. See App. 231, 241. Again, these facts serve to distinguish this case from *American Mini Theatres*, where there was no indication that the Detroit zoning ordinance seriously limited the locations available for adult businesses. See *American Mini Theatres, supra*, at 71, n. 35 (plurality opinion) ("The situation would be quite different if the ordinance had the effect of . . . greatly restricting access to . . . lawful speech"); see also *Basiardanes* v. *City of Galveston*, 682 F. 2d 1203, 1214 (CA5 1982) (ordinance effectively banned adult theaters

by restricting them to "'the most unattractive, inaccessible, and inconvenient areas of a city'"); *Purple Onion, Inc.* v. *Jackson*, 511 F. Supp. 1207, 1217 (ND Ga. 1981) (proposed sites for adult entertainment uses were either "unavailable, unusable, or so inaccessible to the public that . . . they amount to no locations").

Despite the evidence in the record, the Court reasons that the fact "[t]hat respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation." *Ante,* at 54. However, respondents are not on equal footing with other prospective purchasers and lessees, but must conduct business under severe restrictions not imposed upon other establishments. The Court also argues that the First Amendment does not compel "the government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices." *Ibid.* However, respondents do not ask Renton to guarantee low-price sites for their businesses, but seek only a reasonable opportunity to operate adult theaters in the city. By denying them this opportunity, Renton can effectively ban a form of protected speech from its borders. The ordinance "greatly restrict[s] access to . . . lawful speech," *American Mini Theatres, supra,* at 71, n. 35 (plurality opinion), and is plainly unconstitutional.