SUTIN, Judge (dissenting). {47} I respectfully dissent. {48} This case appears to be one constructed by both parties as a single-film-test case of first impression — but ill-fitting in the universe of cases and myriad of constitutional analyses relating to the validity of ordinances that regulate adult amusement establishments. Here is how the district court insightfully and colorfully described the fretful fate it faced. On the surface, the scenario presented by the parties is starkly clear as are the parties’ opposition positions. The law applicable is, however, anything but clear. Indeed, the [cjourt can analogize itself to a small fish navigating through a largely unfathomable murky bayou at night during a storm fully aware of the likelihood of hungry alligators (appellate courts, critical attorneys and legal commentators) lurking nearby. . . . Viewed against the backdrop of the veritable flood of published adult use litigation cases, this appears to be a relatively carefully crafted “test” case on both sides. It is a pity that the law in this area is not as clear as the crafting of the case by the parties. As the City observes: “This case presents the [cjourt with some novel legal issues under New Mexico law in a larger context wherein even the federal courts have been far from uniform.” {49} This case was factually unsatisfactorily developed. It comes to us with no metropolitan court record and no factual record in the district court save a sparse and inadequate stipulation by the parties to the facts. Nevertheless, I address the critical points instead of simply calling for remand for further factual development. In my view, the City’s outlier zoning ordinance (the Ordinance) cannot be enforced against the Guild for two distinct reasons. First, the Guild cannot be considered an “adult amusement establishment” and, second, the Ordinance as applied to the Guild cannot withstand constitutional scrutiny. The Guild Cannot Be Considered an Adult Amusement Establishment {50} The principal question here is whether the Guild should even be considered an adult amusement establishment. The answer is that it should not; and the Ordinance should be construed to exclude the Guild’s single showing. The Guild is an established, mainstream, independent, single-screen, neighborhood, art theater. Year-round, with a single weekend exception, the Guild does not daily or weekly feature or concentrate on sexually oriented conduct in the films it shows. It in no way regularly and substantially shows adult films. Adult amusement establishments, on the other hand, concentrate daily or weekly on sexually oriented adult material. These establishments are theaters that show adult films regularly as a substantial part of their regular business. This description is one from common understanding. As articulated by the court in Schmitty’s City Nightmare, LLC, “[ijt would do violence to the meaning of both ‘oriented’ and ‘establishment’ to conclude that a venue offering only occasional adult entertainment could constitute an establishment ‘oriented’ to adult entertainment. . . . One would not call a bar a ‘martini bar’ if it served martinis only once a year, just as one would not call a club a ‘jazz club’ if 99% of its music was rock and roll.” 391 F. Supp. 2d at 756-57. To characterize the Guild as an “adult amusement establishment” for its single showing of an adult film defies a common understanding of that phrase. {51} In addition, characterization of the Guild as an adult amusement establishment is not supported by case law. It is the adult amusement establishment that gave rise to the use of the negative secondary effects rationale to hold restrictions content-neutral. Two United States Supreme Court film-based cases set the First Amendment precedent on the issue and for this case. The first case is Young, 427 U.S. 50. Young gave origin to First Amendment analyses in regard to zoning of adult theaters. See id. at 56 n.12, 70-71 (stating that “[e]ven though the First Amendment protects communication in [the area of adult films] from total suppression, . . . the State may legitimately use the content of these materials as the basis for placing them in a different classification from other motion pictures” and explaining that the question then remains whether the at-issue ordinances may be justified by the city’s stated “compelling” interest). In Young, the two theaters involved “propose[d] to offer adult fare on a regular basis.” Id. at 59. The Court determined that municipalities may control the location of such theaters “either by confining them to certain specified commercial zones or by requiring that they be dispersed throughout the city.” Id. at 62. The Court stated that “apart from the fact that the . . . classification is predicated on the content of material shown in the respective theaters, the regulation of the place where such films may be exhibited does not offend the First Amendment.” Id. at 63. The Court held that what was “ultimately at stake [was] nothing more than a limitation on the place where adult films may be exhibited, even though the determination of whether a particular film fits that characterization turns on the nature of its content, . . . the city’s interest in the present and future character of its neighborhoods adequately supports its classificationofmotionpictures.” Id. at71-72 (footnote omitted). {52} In the second case, Renton, 475 U.S. 41, two theater owners intended to “exhibit feature-length adult films” and therefore challenged an ordinance prohibiting “any ‘adult motion picture theater’” from certain locations. Id. at 44-45. Construing Young, the Renton Court noted that because the ordinance did not ban adult theaters altogether, the ordinance was “therefore properly analyzed as a form of time, place, and manner regulation.” Id. at 46. The Court noted, too, that “so-called ‘content-neutral’ time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.” Id. at 47. The Court recognized that the ordinance treated theaters that “specializefd] in adult films differently from other kinds of theaters” and that the city’s predominate concerns’ were with the secondary effects of adult theaters” on the surrounding community. Id. The Court concluded, therefore, that the ordinance was “aimed not at the content of the films shown at ‘adult motion picture theaters,’ hut rather at the secondary effects of such theaters on the surrounding community” and that this was “completely consistent” with its definition of content-neutral regulations. Id. at 47-48. The Court also determined that the ordinance was “narrowly tailored to affect only that category of theaters shown to produce the unwanted secondary effects[.]” Id. at 52 (emphasis added) (internal quotation marks and citation omitted). {53} The City enacted the Ordinance under the umbrella of the Young and Renton rulings. This is indicated both by the City’s contention that its goal in enacting the Ordinance was to combat the negative secondary effects produced by adult theaters and that it relied on “numerous studies and other evidence” concerning the adverse secondary effects emanating from adult amusement establishments. Yet, by including the Guild in its definition of “adult amusement establishments,” the City sweeps into its zoning regulation a business that falls outside of the content-neutral scope and rationale of Young and Renton. As delineated in Young and Renton, adult establishments (1) regularly show or “specialize” in the showing of adult films, and (2) they are associated with pernicious or negative secondary effects on the surrounding community or neighborhood. Young, 427 U.S. at 55, 59, 72; Renton, 475 U.S. at 47. {54} Here, the parties stipulated that “[njeither ‘Pornotopia’ generally nor the specific showing of ‘Couch Surfers, Trans Men in Action’ caused any negative secondary effects to businesses on the same street as the Guild or to the neighborhood}.]” Moreover, in its oral argument to this Court, the City conceded that there were no negative secondary effects anticipated from the single showing of an adult film. And, further, the parties stipulated that “[o]ther than one weekend a year when the erotic film festival takes place at the Guild, the Guild shows movies of the art-house variety, i.e, a variety ofboth independent fictional and documentary films that do not contain an emphasis on specified anatomical areas or specified sexual activities.” {55} Because the Guild operates year-round as an “art-house” theater, and because there were no actual or anticipated secondary effects from its single showing of an adult film, the Guild is not properly characterized as an adult amusement establishment as contemplated by the Court in Young and in Renton. In Young and Renton, the ordinances could escape strict scrutiny as content-based precisely and solely because the restrictions were narrowly tailored to cover only the type of establishment shown by studies to cause or likely to cause negative secondary effects. It was that type of establishment that was characterized as an “adult establishment” subject to zoning restriction. {56} Under these circumstances, the reasoning in Tollis, Inc. v. San Bernardino County, 827 F.2d 1329 (9th Cir. 1987), and that in Lucero, 774 P.2d 769, is applicable and persuasive. In Tollis, the court stated: the [cjounty has presented no evidence that a single showing of an adult movie would have any harmful secondary effects on the community. The [c]ounty has thus failed to show that the ordinance, as interpreted by the [cjounty to include any theater that shows an adult movie a single time, is sufficiently narrowly tailored to affect only that category of [theaters] shown to produce the unwanted secondary effects. Nor do we see how the [cjounty could make such a showing, since it is difficult to imagine that only a single showing ever, or only one in a year, would have any meaningful secondary effects. Tollis, Inc., 827 F.2d at 1333 (internal quotation marks and citation omitted); see also BZAPS, Inc., 268 F.3d at 609 (Bye, J., concurring in part and dissenting in part) (“An ordinance that allows the city to regulate the content of a single performance, without presenting evidence that a single performance causes adverse secondary effects, is not narrowly tailored.”). {57} Likewise, when presented with the question of “the appropriate constitutional standard by which to define the ‘use’ necessary to make a movie theater an ‘adult motion picture theater},]’” the California Supreme Court determined that “a ‘single use’ standard [was] insufficiently tailored to serve [the city’s] stated purpose of preventing the clustering or concentration of adult motion picture theaters in any one area.” Lucero, 774 P.2d at 770, 775. The court explained that “[n]othing in the [city] ordinance’s statement of purpose disclose[d] the presence of significant deleterious effects on the community arising out of a single showing of an adult film.” Id. at 775. And, further, relying on Tollis, Inc., the court stated that “a single showing of an adult movie does not necessarily create the logical relationship between the evil feared and the method selected to combat it.” Lucero, 11A P.2d at 775-76 (internal quotation marks and citation omitted). The Lucero court chose to interpret the ordinance as applying only to those adult entertainment theaters “offering adult fare as a substantial part of their regular business, but . . . not [to] apply to theaters showing only occasional or incidental adult movies.” Id. at 777.[1] {58} Here, as in Tollis and Lucero, there exists no persuasive support for the application of the Ordinance to the Guild for its “single showing” of an adult film. There were no secondary effects, nor is there any evidence of a likelihood of negative secondary effects if the Guild is permitted to show an adult film during its one-weelcend-a-year festival.[2] {59} The rationales of Tollis and Lucero bring reason to bear on the application of the Ordinance. The Ordinance should be narrowly construed so as to exclude the Guild, based on a single showing of an objectionable film, from the definition of an “adult amusement establishment.” To narrowly construe the Ordinance in that manner, as applied to the Guild, would be to give the Ordinance constitutionally sound construction. Cf. Northend Cinema, Inc., 585 P.2d at 1157-58 (rejecting a vagueness challenge that was in part based on an ordinance’s failure to clarify “how frequently [adult] films must be shown before a building is ‘used’ for the purpose” of showing adult films, because “any language in the ordinance which is uncertain is readily subject to a narrowing and constitutionally sound construction”); Entm't Prods. Inc. v. Shelby Cnty., Tenn., 588 F.3d 372, 386, 388 n.14 (6th Cir. 2009) (presuming that state courts would refrain from “expansive construction” of adult entertainment if such construction would affect “mainstream artistic performances” or mainstream establishments for the “presentation of a single performance” and noting that “[c]ases of overzealous enforcement against mainstream artistic venues . . . would and should invite litigation by the affected parties on an as-applied basis”). Moreover, by narrowly construing the Ordinance so as to exclude the Guild “from occasionally exhibiting an ‘adult’ film, we . . . [are able to] constru[e] the [Ordinance in a constitutional manner while allowing a reasonable and practical construction in conformity with the purpose of the enactment.” Lucero, 774 P.2d at 776-77; see also Pub. Citizen v. United States Dep’t of Justice, 491 U.S. 440, 455 (1989) (stating that the Supreme Court consistently interprets statutes “to avoid deciding difficult constitutional questions where the text fairly admits of a less problematic construction”); Lovelace Med. Ctr. v. Mendez, 111 N.M. 336, 340, 805 P.2d 603, 607 (1991) (“It is ... a well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions.”). Were It Necessary to Reach the Constitutional Question, As Applied to the Guild, the Ordinance Cannot Withstand Constitutional Scrutiny {60} But for Young and Renton having created the legal fiction that zoning ordinances of the sort at issue here are content-neutral in their regulation of adult establishments, such ordinances would be presumptively unconstitutional and subject to strict scrutiny because they are, in essence, content-based. See Renton, 475 U.S. at 62 (Brennan, J., dissenting) (recognizing that the city’s ordinance was content-based); see also Alameda Books, Inc., 535 U.S. at 434 (stating that content-based regulations are presumptively invalid and are subject to strict scrutiny); Id. at 448 (Kennedy, J., concurring in judgment) (recognizing the inherent “fiction” in classifying adult-establishment zoning ordinances as “content-neutral”). That is, adult-establishment zoning ordinances are considered “content-neutral” if they are predominately concerned with combating negative secondary effects. Owing to their “content-neutral” status, Young- and Rentontype ordinances covering adult establishments are subject to a lesser scrutiny and are constitutionally valid provided that they are narrowly tailored to further the substantial governmental interest of regulating the pernicious secondary effects associated with adult establishments. Alameda Books, Inc., 535 U.S. at 456 (Souter, J., dissenting). {61} Here, as I have already noted, there were no negative secondary effects, nor were any anticipated from the Guild’s single showing of an adult film. The City has failed to carry its evidentiary burden and there exists no evidence in the record of any likelihood of negative secondary effects in the Guild’s neighborhood or elsewhere in the City if the Guild’s singular activity were allowed. Additionally, the City provided no evidence showing why the Ordinance, as applied, furthered a substantial governmental interest. See Renton, 475 U.S. at 47. The City has not shown that the Ordinance affects “only that category of theaters shown to produce the unwanted secondary effects[.]” Id. at 52. Thus, the City has not shown, and cannot show, that the Ordinance, as applied to the Guild’s single showing, is narrowly tailored to serve a substantial governmental interest in restricting the single showing to a zoning quarantined location. Therefore, the Ordinance, as applied to the Guild, did not, and cannot, pass Renton’s lesser scrutiny. As a result, the Ordinance must be considered content-based. Content-based ordinances are subject to strict scrutiny. Alameda Books, Inc., 535 U.S. at 434. {62} Of course, if the Ordinance, as applied to the Guild’s single showing, cannot pass the Renton lesser scrutiny, the Ordinance clearly cannotpass constitutional muster under a strict scrutiny analysis. The City simply cannot show that the Ordinance, as applied to the Guild’s single showing, is narrowly tailored to serve a compelling governmental interest in restricting the single showing to a zoning quarantined location. See ACLU of N.M., 2006-NMCA-078, ¶ 19 (stating the government’s burden under a strict scrutiny analysis). {63} With regard to the lesser Renton scrutiny and to strict scrutiny, the City cannot reasonably contend that the Ordinance cannot be more narrowly tailored. The City knows how to narrowly tailor an ordinance. It has done so with respect to commercial establishments that provide pornographic material. After defining the whole gamut of “adult material” in Section 14-16-1-5(B) of the Ordinance, the Ordinance defines an “adult store” as “[a]n establishment having 25% or more of its shelf space or square footage devoted to the display, rental, sale},] or viewing of adult material for any form of consideration.” Albuquerque, N.M., Rev. Ordinances § 14-16-1-5(B). The Ordinance’s silence as to stores having 24% or less of its shelf space or square footage devoted to adult material demonstrates that the Ordinance is narrowly tailored to allow stores to provide adult material as long as certain shelf space or square footage restrictions are met. The narrow tailoring obviously applies, for example, to mainstream bookstores. On the other hand, the Ordinance’s application to the Guild, a mainstream, single-screen art theater, lacks any narrow tailoring whatsoever. Accordingly, while the definition of “adult store” reflects the City’s conclusion that an establishment that offers adult material for public consumption may do so without the likelihood of harmful secondary effects associated with adult amusement establishments so long as the adult material comprises less than one-fourth of the business’s offerings, the City has made no attempt to apply that reasoning to adult amusement establishments. {64} When questioned about this tailoring at oral argument, the City offered no plausible explanation as to why similar narrow tailoring could not be accomplished with respect to theaters such as the Guild. Counsel for the City posited that “there is a difference between buying ... an erotic book and walking out of the store with it, and watching an erotic conduct with a group of people.” Counsel provided no further explanation. The explanation did not touch on the question of negative secondary effects and there was no evidence to support the City’s assertion. All that the City could muster further was that “[t]here just is” such a difference and that the “percentage” approach cannot be taken with respect to movies. Given that the City has conceded that “it’s not the art-house theater’s showing the single instance that the City is concerned about” and given that the City has produced no evidence of any likely negative secondary effects occurring in the future if the Guild is allowed its single showing on this occasion, I am unable to see how the City can narrowly tailor the Ordinance to allow certain adult stores to regularly and to some substantial degree provide adult material, yet find no way to do the same with regard to activity such as that of the Guild at issue here. Unproven Future Concerns {65} Although the Guild cannot be considered an adult amusement establishment and the Ordinance cannot withstand constitutional scrutiny, I recognize there is some difficultly as a result of the parties’ malconstruction of this case. By presenting a case of a single showing of one film, and nothing more, the parties have offered no particular limit on the showing of other adult films including the number of showings during any particular period of time. This opens up possibly legitimate governmental concerns about having to deal with expanded showings by the Guild and with the possibility of other, similar theaters popping up in the same or new neighborhoods showing one or more adult films. It leaves the City with the difficult task of writing a narrowly tailored ordinance that will survive constitutional scrutiny. At what point will an establishment come within the Young and Renton concept of an adult amusement establishment the existence of which, as the law seems now to stand, is presumed likely to create negative secondary effects? {66} The closest the City comes to meeting these concerns is the City’s statement in oral argument that “it’s not the art-house theater’s showing the single instance that the City is concerned about, it’s the dynamic and broad issue that if they can do it, others can do it.” In oral argument, the City stated its concern to be that conduct which in its “aggregate ... produce[s] negative secondary effects,” and the City also indicated a “pragmatic” concern as to the difficulty in convicting beyond a reasonable doubt under a “regular and substantial course of conduct standard.” In the district court proceedings, the court characterized the City as arguing that “the constitutional standards under which [the City’s zoning ordinances] were passed and enforced, recognize a dynamic and broad view of land use conduct.” Therefore, the City argued in the district court that there existed “no constitutional requirement that the City show a discrete secondary harmful effect from a single event.” Yet, the City presented no evidence relating to any of these concerns. And the City has supplied no authority for or content to its general and formless theory that because zoning ordinances are “dynamic and broad” the Ordinance is justified. {67} By its vague “broad and dynamic” argument, the City appears to be saying that its zoning needs to be broad enough to reach and cover each and every future circumstance involving not only a single showing but incremental increases in showings of adult-content films. While I can appreciate the City’s concerns, in the context of First Amendment rights and the lack of evidence in this case, the City’s “broad and dynamic” theory is much too nebulous to carry the weight it must have to give the Ordinance a narrowly tailored status. It is noteworthy that the district court did not rely on this theory in its extensive decision, nor does the Majority Opinion affirm the district court on this theory. {68} In the balance of things, at one end of the pornographic film business spectrum, we have regular and substantial activity of an acknowledged sexual-oriented adult amusement establishment in the Young and Renton sense. At the other end, is a single showing by an acknowledged mainstream, independent, single-screen, neighborhood art theater. The First Amendment and Article II, Section 17 ofthe New Mexico Constitution do not permit the bright-line, all-inclusive zoning test and criminal ordinance coverage held valid by the Majority Opinion — held valid based on the illogic of presumed negative secondary effects attributable to the Young and Renton version of adult amusement establishments.[3] Instead, the City must specifically prove a reasonable and rational correlation between allowing the Guild’s activity and likelihood thatnegative secondary effects in the neighborhood or elsewhere in the City will result. Short of that proof, for the Ordinance to survive it must be narrowly tailored so that it does not subject the Guild to criminal liability. The First Amendment and Article II, Section 17 of the New Mexico Constitution plainly override the broad land-use zoning theory advanced by the City. CONCLUSION {69} The Ordinance and the Majority’s view that it is constitutional as applied to the Guild, are based on a false premise that all theaters that feature a film having an emphasis on depiction of adult material can reasonably and unquestionably be considered adult amusement establishments and therefore subject to criminal prosecution. There exist two independent reasons for holding that the City cannot, pursuant to the Ordinance, criminally sanction the Guild. First, the Guild is not an adult amusement establishment in the common usage and understanding of the phrase and as contemplated by Young and Renton. And the Ordinance can and should, therefore, be narrowly construed to exclude the Guild’s showing of a single film from its definition of an adult entertainment establishment. {70} Second, if the Ordinance is nevertheless construed to apply to the Guild, it fails any applicable constitutional scrutiny. The Ordinance must be, but is not, narrowly tailored to further a compelling or substantial governmental interest, as applied to the Guild. No compelling or substantial governmental interest has been shown to exist for application of the Ordinance to the Guild. The Ordinance is, therefore, unconstitutional as applied to the Guild. The City is not precluded from engaging in the experimentation it is permitted under Young. See Young, 427 U.S. at 71 (stating that “the city must be allowed a reasonable opportunity to experiment with [zoning] solutions to admittedly serious problems”). Indeed, the City may well need to experiment further in order to find the narrow tailoring that constitutionally fits. JONATHAN B. SUTIN, Judge I note Justice Mosk’s separate opinion in which he agrees with the constitutional impropriety of the standard employed by the city but points to the danger of the majority setting the standard instead of “allowing cities to experiment with various solutions to the serious problems created by urban blightf,]” citing Renton and Young, when “[t]o do so the majority must reach out to decide this issue without the benefit of a developed record” among other considerations. Lucero, 774 P.2d at 779 (Mosk, J., concurring and dissenting). 1 understand that the weekend festival may show more than one film that the City might see as objectionable. But that is not the circumstance the parties brought to this Court. They chose the limited, single-film circumstance. The circumstance of showing more than one objectionable film must, unfortunately, be litigated in another case unless, of course, the Majority Opinion stands. The district court commented that although, in an as-applied context, the court “does not believe that a single showing standard is per se constitutionally invalid, it is in an anomalous place along the continuum of single use to full blown adult establishment in the miasmic collection of adult use law.”