[No. S002438. June 29, 1989.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
JOSE RONILLO ABOGADO LUCERO et al., Real Parties in
Interest.

**COUNSEL**

John A. Vander Lans, City Prosecutor, Robert R. Recknagel, Assistant City Prosecutor, and Gerry L. Ensley, Deputy City Prosecutor, for Petitioner.

No appearance for Respondent.

Fleishman, Fisher & Moest, Stanley Fleishman, Barry A. Fisher, Robert C. Moest and David Grosz for Real Parties in Interest.

---

**OPINION**

**LUCAS, C. J.**—This case involves the enforcement of a Long Beach zoning ordinance that prohibits the location of "adult entertainment businesses" (including adult motion picture theaters) within 500 feet of residential areas, or 1,000 feet of public schools or churches (Long Beach Mun. Code, ch. 21.51, hereafter Chapter 21.51). The ordinance is described as a "non-cluster" or "Anti-skid Row" ordinance because it is designed to discourage development of a "skid row" area by limiting the harmful secondary effects of adult entertainment businesses on adjacent areas, and by insuring such businesses do not contribute to the blighting of surrounding neighborhoods. (See Ch. 21.51.010, "Purpose.") It was patterned after a Detroit adult entertainment zoning ordinance upheld in *Young* v. *American Mini Theaters, Inc.* (1976) 427 U.S. 50 [49 L.Ed.2d 310, 96 S.Ct. 2440].

The question before us concerns the appropriate constitutional standard by which to define the "use" necessary to make a movie theater an "adult motion picture theater" within the meaning of the ordinance.[1] In *Pringle* v. *City of Covina* (1981) 115 Cal.App.3d 151 [171 Cal.Rptr. 251], the Court of Appeal held that an adult entertainment zoning ordinance cannot be enforced against an adult motion picture theater unless a "preponderance" (meaning "more often than not") of the "adult" films shown by the establishment have as their dominant theme the depiction of the ordinance's enumerated sexual activities.

In following *Pringle,* subsequent cases interpreting adult entertainment ordinances have required "use" to be defined as "over 50 percent." (*Strand Property Corp.* v. *Municipal Court* (1983) 148 Cal.App.3d 882, 889 [200 Cal.Rptr. 47] [construing "use" defined under the ordinance as a "substantial or significant portion of the total presentation time to mean a "preponderance" that must be defined as "over 50 percent"]; *Kuhns* v. *Board of Supervisors* (1982) 128 Cal.App.3d 369, 376 [181 Cal.Rptr. 1] [construing

---

[1] The ordinance defines an adult motion picture theater as "an enclosed building with a capacity of fifty or more persons used for presenting material distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas for observation by patrons therein." (Ch. 21.51, § 21.51.020 (A)(2).) Chapter 21.51 is set forth in the appendix.

"use" defined as a "substantial or significant portion of stock in trade" in adult bookstore ordinance to mean "over half of a bookstore's stock"].) Moreover, the present Court of Appeal believed the People were bound by *Pringle*'s preponderance standard. (*Post,* at p. 20.) We disagree. ■■■ As we explain, although municipalities are free to adopt such a test in defining "use" under an adult entertainment ordinance, we conclude *Pringle*'s preponderance standard is not constitutionally compelled. In place of such a test, we adopt a constitutional standard similar to that recently approved by the United States Supreme Court and several state courts: cities may zone the location of theaters that show, on a regular basis, films characterized by an emphasis on the "specified sexual activities" or "specified anatomical areas" identified in the ordinance, where such films constitute a substantial portion of the films shown or account for a substantial part of the revenues derived from the exhibition of films (hereafter "the regular and substantial course of conduct" standard). (See, e.g., *Renton* v. *Playtime Theaters, Inc.* (1986) 475 U.S. 41, 55, fn. 4 [89 L.Ed.2d 29, 37, 106 S.Ct. 925]; *Young, supra,* 427 U.S. at p. 59 [49 L.Ed.2d at p. 316]; see also *Town of Islip* v. *Caviglia* (1988) 141 A.D.2d 148 [532 N.Y.S.2d 783, 784-785, fn. 2].)

## I. *Facts*

Real parties in interest Jose Ronillo Abogado Lucero, Walnut Properties, Inc., and Jimmie Johnson (hereafter real parties) were charged in separate misdemeanor complaints with numerous counts of unlawfully establishing an adult entertainment business in violation of Chapter 21.51.

Real parties' establishment, the Lakewood Theater, has two screens: one screen shows general release films and one screen shows adult films. Each count of the misdemeanor complaints specifically alleged real parties unlawfully established an adult theater in violation of Chapter 21.51 by exhibiting an X-rated movie on a particular day within the distances proscribed by the ordinance.

Real parties filed demurrers to the complaints on the ground that exhibition of a single adult film, as alleged in the complaints, did not make the theater an adult entertainment business under the preponderance standard established by *Pringle, supra,* 115 Cal.App.3d 151. After the municipal court overruled the demurrers, real parties petitioned the superior court for a peremptory writ of mandate directing the lower court to sustain the demurrers. The superior court granted the writ with leave to amend. The People declined to amend and instead requested the Court of Appeal to issue a writ of mandate to compel the superior court to vacate its judgment.

The Court of Appeal denied the writ and rejected the People's contention that a *single* showing of an adult film makes the theater an adult motion picture theater within the meaning of the zoning ordinance. ■■ ■
■■ The court first rejected the People's argument that the "single use" standard adopted by the Court of Appeal in *Walnut Properties* v. *Ussery* (Cal. App.)[2] should control the outcome of the present litigation under the law of the case and collateral estoppel doctrines.[3]

Next, in rejecting the People's contention that a "single use" standard should apply, the Court of Appeal cited with approval *Tollis, Inc.* v. *San Bernardino County* (9th Cir. 1987) 827 F.2d 1329, which held that a "single use" interpretation of an adult entertainment zoning ordinance was unconstitutional in the absence of evidence "that a single showing of an adult movie would have any harmful secondary effects on the community." (*Id.* at p. 1333.) The Court of Appeal then denied the People's petition for writ of mandate because the complaints "did not allege, in accordance with the requirements of *Pringle,* that the preponderance of films exhibited and observed by pátrons at the Lakewood Theater were 'distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specific anatomical areas' (Chapter 21.51.020(A) . . .) as those terms are defined in Chapter 21.51.020(B)(1-7) and (C)(1-2) of the Long Beach Municipal Code." In reviewing the Court of Appeal opinion, we examine the People's argument requesting we affirm as constitutionally permissible a "single use" standard.

---

[2] We ordered the opinion not published in the Official Reports by order dated June 24, 1986 (B005781).

[3] The *Ussery* case involved the same parties, theater and ordinance as in the present case. The court in *Ussery* observed that the only way to prevent the undesirable effects of adult theaters on the surrounding neighborhoods, and to implement the zoning ordinance according to the intent of its drafters, was to prohibit any use of the theater for showing adult motion pictures.

In rejecting the People's law-of-the-case and collateral estoppel arguments, the Court of Appeal first observed that *Lucero* was a criminal case, instituted well after *Ussery,* a civil case, became final and therefore the doctrine of law of the case should not apply. We agree. We also agree with the Court of Appeal's decision not to apply the collateral estoppel doctrine to defendants. First, it is highly questionable whether a prior determination against a party in a civil action may be applied as a collateral estoppel against that same party in a criminal action. (See *Ashe* v. *Swenson* (1970) 397 U.S. 436 [25 L.Ed.2d 469, 90 S.Ct. 1189].) In addition, if *Ussery* were given collateral estoppel effect in this case, the single-instance standard would apply to Lakewood Theater and the preponderance standard enunciated in *Pringle* (115 Cal.App.3d 151) which is the only published decision on this issue would apply to all other theaters. Such an unjust result would disserve the public interest. (See *Consumers Lobby Against Monopolies* v. *Public Utils. Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41].)"

## II. *Background*

### A. *Constitutionality of adult entertainment zoning*

In August 1977 Walnut Properties, Inc. (hereafter Walnut), obtained a business license to operate a motion picture theater on the representation that it intended to exhibit nonadult films. (*Walnut Properties* v. *City Council of the City of Long Beach* (1980) 100 Cal.App.3d 1018, 1024 [161 Cal.Rptr. 411].) In November of that year, following the high court's decision in *Young, supra,* 427 U.S. 50, the city enacted Municipal Code Chapter 9120.41, which was amended in 1979 to become Chapter 21.51, the ordinance at issue in the present case. The 1979 ordinance is substantially similar to the 1977 version—its primary purpose being to regulate the location of adult motion picture theaters. After the ordinance was passed Walnut began showing adult films.

In December 1977, shortly after Walnut opened its theater, the Long Beach City Council instituted proceedings culminating in the revocation of Walnut's operating license. Walnut sued the city, challenging the constitutionality of the ordinance. (*Walnut Properties, supra,* 100 Cal.App.3d at p. 1020.) After conceding that its theater was an "adult entertainment business" as defined by the ordinance, Walnut argued the ordinance violated the First Amendment's freedom of speech clause as an unconstitutional regulation of constitutionally protected conduct. In addition, Walnut claimed that the ordinance was vague, overbroad and vested public officials with impermissible discretion to enforce its terms. (*Id.* at p. 1021; see, e.g., *Burton* v. *Municipal Court* (1968) 68 Cal.2d 684 [68 Cal.Rptr. 721, 441 P.2d 281].) The ordinance survived constitutional scrutiny, however, after the Court of Appeal found *Young, supra,* 427 U.S. 50, dispositive of the constitutional issues. (*Walnut Properties, supra,* 100 Cal.App.3d at p. 1023.)

The two Detroit ordinances at issue in *Young* were termed "Anti-skid Row" ordinances because they prohibited (except where a special waiver was obtained) locating adult theaters and adult bookstores within 1,000 feet of any two other "regulated uses" or within 500 feet of any residential zone. The ordinances' definition of an "adult motion picture theater" was identical to that of the Long Beach ordinance we discuss here. (*Young, supra,* 427 U.S. at pp. 53-54, fn. 5 [49 L.Ed.2d at p. 316].)

The plurality, led by Justice Stevens, upheld the ordinances on the basis they were not directed at restricting speech, but rather were reasonable time, place and manner regulations necessary to further the city's

significant interest in preserving the character of its neighborhoods. The *Young* court concluded that as long as such ordinances were enacted to regulate the location of adult theaters in order to protect neighborhoods from deterioration, increased crime and other harmful secondary effects, they did not offend either the First Amendment or the equal protection clause of the Fourteenth Amendment. (*Young, supra*, 427 U.S. 50, 68-73 [49 L.Ed.2d 310, 324-327]; see *Developments in the Law—Zoning* (1978) 91 Harv.L.Rev. 1427, 1557-1559.)[4]

Based on the high court's reasoning in *Young, supra*, 427 U.S. 50, the *Walnut Properties* Court of Appeal rejected Walnut's First Amendment argument. The court reasoned, "It is clearly within the power of the City to provide that *no* motion picture theatre can be operated in a residential area or near a public school. The thrust of Justice Stevens' opinion in *Young* was that it was also within the City's power to classify theatres according to the content of the films exhibited, so long as that classification has a reasonable basis. The 'adult entertainment' classification is a reasonable one. [¶] Walnut has presented no evidence that the City's ordinance in any way restricts or eliminates the access to the 'adult entertainment' for those persons who desire to patronize it. In fact, Walnut operates another such theater in a different part of the City. From records which we may judicially notice, it appears that Long Beach has a number of 'adult' forms of entertainment operating within its boundaries." (*Walnut Properties, supra*, 100 Cal.App.3d 1018, 1023.)

---

[4] The *Young* court noted that under the ordinances "adult films may only be exhibited commercially in licensed theaters." (*Young, supra*, 427 U.S. at p. 62 [49 L.Ed.2d at p. 321].) The court observed, however, that the "city's general zoning laws require all motion picture theaters to satisfy certain locational as well as other requirements; we have no doubt that the municipality may control the location of theaters as well as the location of other commercial establishments, either by confining them to certain specified commercial zones or by requiring that they be dispersed throughout the city. The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances." (*Ibid.*)

The *Young* court also rejected the theater owner's vagueness attack on the ordinances on the basis that "Neither respondent . . . alleged any basis for claiming or anticipating any waiver of the restriction as applied to its theater." (*Young, supra*, 427 U.S. at p. 59 [49 L.Ed.2d at p. 319].) The court observed that "the only vagueness in the ordinances relates to the amount of sexually explicit activity that may be portrayed before the material can be said to be 'characterized by an emphasis' on such matter. For most films the question will be readily answerable; to the extent that an area of doubt exists, we see no reason why the ordinances are not 'readily subject to a narrowing construction by the state courts' . . . . [W]e think this is an inappropriate case in which to adjudicate the hypothetical claims of persons not before the Court." (*Id.* at p. 61 [49 L.Ed.2d at p. 320].)

Finally, the court held that the Detroit ordinance created no "significant deterrent effect" that would justify invocation of the First Amendment "overbreadth" doctrine. (*Young, supra*, 427 U.S. at pp. 59-60 [49 L.Ed.2d at pp. 319-320].)

B. *Pringle's "preponderance" standard*

In *Pringle, supra,* 115 Cal.App.3d 151, the City of Covina had enacted a "non-cluster" zoning ordinance prohibiting location of adult entertainment theaters within 500 feet of residential and other enumerated areas. The ordinance employed a substantially similar definition of an adult theater as the Long Beach ordinance we review herein. (*Ante,* at fn. 1; see Covina Mun. Code, § 17.04.026.2.) The ordinance declared its purpose was " 'to insure that adverse effects [arising from the "serious objectionable operational characteristics" of adult theaters] will not contribute to the blighting or downgrading of the surrounding neighborhood and will not unreasonably interfere with or injure nearby properties.' " (*Id.* at p. 154, quoting from Covina Mun. Code, § 17.04.026.2.)

The plaintiffs, a neighborhood theater owner and a patron, instituted an action for declaratory and injunctive relief "alleging that the ordinance violated federal and state guarantees of freedom of speech, due process and equal protection. They claimed that the ordinance was unconstitutional on its face and, as construed to apply 'to the operation of a neighborhood theatre which shows a variety of films including a few films which, although not obscene, explicitly depict sexual activity arguably within the scope of the ordinance.' They further argued that the terms 'distinguished or characterized by an emphasis' and 'used' were too vague and chilled freedom of expression." (*Pringle, supra,* 115 Cal.App.3d at p. 155.) The defendant city argued that the ordinance was valid under *Young, supra,* 427 U.S. 50, and asserted that the term "use" should be construed as meaning " '[o]ne showing of a film described in the ordinance.' " (*Pringle, supra,* 115 Cal.App.3d at p. 156.)

The *Pringle* court recognized that it was faced "with an actual, not hypothetical, claim of uncertainty deterring the exercise of protected speech" (115 Cal.App.3d at p. 160), and that it was bound to construe the legislation "if reasonably possible to preserve its constitutionality." The court first construed the ordinance's applicability regarding the dominant or essential theme of the movie. (At p. 160.) It concluded that "adult films under the ordinance include only films whose dominant or predominant character and theme is the depiction of the enumerated sexual activities or anatomical areas." (*Ibid.*)

Next, the court determined that the word "used" in the "ordinance's definition of an adult theatre as a building 'used for presenting' sexually explicit material" rendered the ordinance vague—and hence constitutionally infirm—because it failed to indicate "what proportion of a theatre's programming would constitute 'use.' " (*Pringle, supra,* 115 Cal.App.3d at

p. 161.) To preserve the constitutional validity of the ordinance (*id.* at pp. 158, 162), the *Pringle* court defined "use" under the ordinance to mean "to practice customarily," but qualified the phrase to mean "more often than not." Based on the foregoing, the court adopted a "preponderance" standard. (*Id.* at p. 162.)

### C. *Post-Young federal cases*

Two federal decisions decided after *Young, supra,* 427 U.S. 50, and *Pringle, supra,* 115 Cal.App.3d 151, shed further light on the interpretation of language similar to that at issue here. Both involved constitutional challenges to adult entertainment zoning ordinances similar to the one examined by the court in *Young.*

In *Renton* v. *Playtime Theaters, Inc., supra,* 475 U.S. 41, two theater operators whose theaters exhibited adult films and were located within an area proscribed by adult entertainment zoning restrictions challenged the Renton ordinance under the First and Fourteenth Amendments. The high court determined that the ordinance was a valid "time, place and manner" measure because it did "not ban adult theaters altogether, but merely provide[d] that such theaters [could] not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school." (*Id.* at p. 46 [89 L.Ed.2d at p. 37].) Next, while recognizing that the Renton ordinance treated "theaters that specialize in adult films differently from other kinds of theaters" (*id.* at p. 47 [89 L.Ed.2d at p. 37]), the court observed that the regulation "was unrelated to the suppression of free expression" because it did not proscribe the content of the films, but rather was concerned predominately with the deleterious secondary effects of adult theaters on the neighboring community. (*Ibid.*)

In concluding that the ordinance was "designed to serve a substantial government interest and allow[ed] for reasonable alternative avenues of communication," the *Renton* court stated that the city's substantial interest in preserving " 'the quality of urban life' " justified the enactment. (*Renton, supra,* 475 U.S. at p. 50 [89 L.Ed.2d at p. 39].) ██ ██ Moreover, the court observed that it was appropriate for Renton to have relied on relevant studies conducted by other cities on the need for zoning controls of adult theaters in order to establish its "substantial government interest" in regulating adult theaters. (*Id.* at pp. 51-52 [89 L.Ed.2d at p. 40-41].)[5]

---

[5] The *Renton* court specifically stated that "Renton was entitled to rely on the experiences of Seattle and other cities, and in particular on the 'detailed findings' summarized in the Washington Supreme Court's *Northend Cinema* opinion, in enacting its adult theater zoning ordinance. The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other

■ The court further noted that the Renton ordinance left approximately 520 acres open to use as potential adult theater locations. Accordingly, the court determined the ordinance would allow "for reasonable alternative avenues of communication."[6] (*Renton, supra,* 475 U.S. at p. 53 [89 L.Ed.2d at p. 41].) Thus, the court concluded, the ordinance represented a valid governmental response to the serious problems created by adult theaters and met the goals of the city in preserving the quality of life within the community while "satisfying the dictates of the First Amendment." (*Id.* at pp. 54-55 [89 L.Ed.2d at p. 42].)

Thereafter, in 1987, an operator of an adult motion picture establishment challenged, in federal court, the constitutionality of a San Bernardino County ordinance similar in language and substance to the "Anti-skid Row" ordinances discussed above, with the exception that the ordinance was silent as to its predominate purpose. (*Tollis, Inc.* v. *San Bernardino County, supra,* 827 F.2d 1329, 1332.) The county argued that the ordinance should be construed so as to prohibit even a "single showing" of an adult motion picture. The theater owner responded that such construction would be unconstitutionally overbroad on its face under *Young, supra,* 427 U.S. 50, and *Renton, supra,* 475 U.S. 41. (*Tollis, supra,* 827 F.2d at p. 1331.)

■ The Ninth Circuit agreed with the theater owner and found that a "single use" standard could not pass "constitutional muster as a content-neutral time, place, and manner regulation" because it could not be justified as serving a substantial governmental interest in preserving the quality of urban life. (*Tollis, supra,* 827 F.2d at pp. 1332-1333.) As we explain below, we believe, like the *Tollis* court, that so construed the Long Beach ordinance would be unconstitutional.

cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." (*Id.* at pp. 51-52 [89 L.Ed.2d at p. 40].)

Finally, the court observed that the method chosen by a city to further its substantial interests—e.g., cluster as opposed to noncluster zoning—would not affect its holding. The court noted that "cities may regulate adult theaters by dispersing them, as in Detroit, or by effectively concentrating them, as in Renton, 'It is not our function to appraise the wisdom of [the city's] decision to require adult theaters to be separated rather than concentrated in the same areas . . . . [T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.' " (*Id.* at p. 52 [89 L.Ed.2d at p. 41], quoting *Young, supra,* 427 U.S. at p. 71 [49 L.Ed.2d at pp. 326-327], original brackets.)

[6] In response to the theater owners' (repondents) argument that there were no "commercially viable" adult theater sites within the 520 acres left available by the Renton ordinance, the court observed that "we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices. . . . In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance before us easily meets this requirement." (*Renton, supra,* 475 U.S. at p. 54 [89 L.Ed.2d at p. 42].)

### III. *A constitutional zoning standard*

Although *Tollis, supra*, 827 F.2d 1329, is not dispositive, we believe it applied the correct constitutional principle first articulated in *Young, supra*, 427 U.S. 50, and developed by *Renton, supra*, 475 U.S. 41. As *Tollis* recognized, *Renton* requires the court to determine whether the ordinance, as implemented, is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication. (*Tollis, supra*, 827 F.2d at pp. 1332-1333.) Like the Ninth Circuit, we find a "single use" standard is insufficiently tailored to serve Long Beach's stated purpose of preventing the clustering or concentration of adult motion picture theaters in any one area. Nothing in the Long Beach ordinance's statement of purpose discloses the presence of significant deleterious effects on the community arising out of a single showing of an adult film. We also agree with the *Tollis* court that a single showing of an adult movie does not necessarily create the "logical relationship between the evil feared and the method selected to combat it." (*Id*. at pp. 1332-1333.)[7]

 Nor do we believe, however, that *Pringle*'s preponderance standard is constitutionally compelled. As stated above, *Pringle* would allow the zoning of adult theaters only if a preponderance (construed to mean "more often than not" or "most often") of the films shown have as their dominant theme the depiction of the ordinance's enumerated sexual activities. (*Pringle, supra*, 115 Cal.App.3d at p. 162.) We find nothing in the high court's cases suggesting such a standard is required. Indeed, a preponderance standard violates the spirit of the high court's cases. Those decisions expressly recognize a state's legitimate interest in regulating adult entertainment establishments, and accord local governments substantial discretion in defining the scope and nature of such regulation. (*Young, supra*, 427 U.S. at p. 61 [49 L.Ed.2d at pp. 320-321]; *Renton, supra*, 475 U.S. at pp. 51-52 [89 L.Ed.2d at p. 40].)

 Accordingly, we conclude that *Pringle,* in striving to construe the term "used" within the confines of constitutional principles, established a standard that is too high.[8]

---

[7] Real parties argue that if we were to impose a "single use" standard in this case, the procedures for obtaining a waiver would operate as an invalid prior restraint on theater owners. Because we reject the "single use" standard as unconstitutional on other grounds, we need not consider the merits of this claim.

[8] The exact basis of the *Pringle* decision is not entirely clear. To the extent *Pringle* may be interpreted as a constitutional "floor" in the traditional sense (i.e., that the municipalities are constitutionally precluded from regulating theaters showing less than a preponderance of adult films), we believe it to be inconsistent with the basic principles of *Young* and *Renton* and unduly restrictive of the municipalities' legitimate interest in regulating adult entertainment establishments. (See *post,* fn. 10.) It defies common sense to hold that a theater exhibit-

The question then becomes whether we can articulate a constitutional standard that will both implement the purpose of the ordinance and abide by the requirements of *Young, supra*, 427 U.S. 50, and *Renton, supra*, 475 U.S. 41 (i.e., that an ordinance be content-neutral and narrowly tailored to minimize only the adverse secondary effects related to adult entertainment establishments). The Long Beach ordinance was passed specifically because "[T]he city council [found] that adult entertainment businesses, because of their very nature, are recognized as having objectionable operational characteristics, particularly when several of them are concentrated under certain circumstances, thereby having a deleterious effect upon the adjacent areas. Special locational regulation of these businesses is necessary to insure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhoods. The primary purpose of the regulation is to prevent the concentration or clustering of these businesses in any one area." (Long Beach Mun. Ord. C-5487 § 1 (1979).)

Because adult entertainment ordinances are aimed at regulating the clustered establishment of adult entertainment businesses and not at prohibiting theater owners from occasionally exhibiting an "adult" film, we conclude a "regular and substantial course of conduct" standard most appropriately defines the constitutional level of "use" for purposes of such ordinances. In so doing, we allow cities a greater flexibility in the zoning of adult entertainment theaters, thereby construing the ordinance in a constitutional manner while allowing a reasonable and practical construction in conformity with the purpose of the enactment. (*Welton* v. *City of Los Angeles* (1976) 18 Cal.3d 497, 506 [134 Cal.Rptr. 668, 556 P.2d 1119]; *Shea* v. *Board of Medical Examiners* (1978) 81 Cal.App.3d 564, 574 [146 Cal.Rptr. 653].)

By interpreting the term "used" in this case to mean a "regular and substantial course of conduct," we give the ordinance a construction that is rationally tailored to support its asserted purpose of preventing neighbor-

ing "adult" films during less than 51 percent of its total operating time *must* be treated as something other than an adult establishment as that term can be reasonably understood in this context. Nonetheless, so long as the theater does not "preponderantly" or more often than not exhibit adult movies, *Pringle*'s test allows adult entertainment theaters to be established in contravention of the purpose of the ordinance.

Moreover, to the extent *Pringle* may be interpreted as an exercise of simple statutory construction, we find it equally flawed. The *Pringle* court correctly noted that vague or ambiguous terms in a legislation are to be construed, where possible, so as to preserve their constitutionality. (*Pringle, supra*, 115 Cal.App.3d at p. 160.) In so doing, however, the court must give the ordinance a construction which conforms both to the dictates of the Constitution and to the *purposes* of the enactment. Indeed, we believe the "regular and substantial course of conduct" is a reasonable interpretation of "use" under the Long Beach ordinance because it more closely conforms to the purpose of the ordinance than did *Pringle*'s preponderance (over 50 percent) test. Accordingly, we must reject *Pringle* on statutory construction grounds as well.

hood blight without allowing Long Beach to use "the power to zone as a pretext for suppressing expression." (*Young, supra,* 427 U.S. at p. 84 [49 L.Ed.2d at p. 334].) Under this standard, zoning restrictions such as contained in the ordinance at issue here would apply to all adult entertainment theaters offering adult fare as a substantial part of their regular business, but would not apply to theaters showing only occasional or incidental adult movies.[9] To the extent *Pringle, supra,* 115 Cal.App.3d 151, conflicts with the foregoing standard, the case is disapproved.[10]

## IV. *Disposition*

The People, having alleged multiple violations of Chapter 21.51, section 21.51.030 of the Long Beach Municipal Code, each based on the unconstitutional "single use" standard, are not entitled to proceed with the action as pleaded. Accordingly, the judgment of the Court of Appeal is affirmed.[11]

Panelli, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—

I

I concur in the judgment.

The majority correctly strike down the "single use" standard as unconstitutional. They err, however, by jettisoning the "preponderance" standard in use for the past eight years and creating an entirely new and vague "regular and substantial course of conduct" standard. I therefore dissent from that portion of the opinion.

---

[9] We recognize that although our definition is not exact, it is "reasonably specific and precise, bearing in mind that unavoidable imprecision is not fatal and celestial precision is not necessary." (*Hart Book Stores, Inc.* v. *Edmisten* (4th Cir. 1979) 612 F.2d 821, 833, cert. den. (1980) 447 U.S. 929 [65 L.Ed.2d 1124, 100 S.Ct. 3028].) We emphasize Long Beach is free to further define the standard—for example, by making reference to a percentage of films shown, or the percentage of revenue received by the adult entertainment business. It may also amend its ordinance to impose less restrictive standards.

[10] As stated above *Pringle*'s "preponderance" standard has been interpreted in Court of Appeal cases as requiring the showing of over 50 percent adult movies before a theater can be labeled an adult theater: *Kuhns* v. *Board of Supervisors, supra,* 128 Cal.App.3d 369, 376; *Strand Property Corp.* v. *Municipal Court, supra,* 148 Cal.App.3d 882, 889-890. These cases predate *Renton, supra,* 475 U.S. 41, and merely rely on *Pringle*. To the extent they interpret *Pringle* as imposing a constitutional floor, we find they are no more persuasive than *Pringle, supra,* and are likewise disapproved.

[11] Of course, our disposition does not preclude the People from prosecuting future violations of Chapter 21.51 under the "regular and substantial course of conduct" standard discussed above.

The majority read the decision of *Pringle* v. *City of Covina* (1981) 115 Cal.App.3d 151 [171 Cal.Rptr. 251] too broadly; it does not establish the preponderance standard as the limit of regulatory power for every locality in the state. Moreover, it is inappropriate to weave a new standard—one which apparently is meant to set a statewide regulatory floor—out of whole cloth. To do so the majority must reach out to decide this issue without the benefit of a developed record, without the benefit of briefing and, most importantly, in contravention of the spirit of United States Supreme Court decisions that emphasize the importance of allowing cities to experiment with various solutions to the serious problems created by urban blight. (See, e.g., *Renton* v. *Playtime Theatres, Inc.* (1986) 475 U.S. 41, 52 [89 L.Ed.2d 29, 40-41, 106 S.Ct. 925] (hereafter *Renton*); *Young* v. *American Mini Theatres* (1976) 427 U.S. 50, 71 [49 L.Ed.2d 310, 326-327, 96 S.Ct. 2440] (hereafter *Young*).)

The result is judicial legislating. Creation of the "regular and substantial course of conduct" standard is unjustified because we have been presented with no evidence that the new untested standard would ameliorate the secondary effects of adult-oriented businesses while accommodating individuals' access to communications protected by the free speech provisions of the federal and state Constitutions.

## II

Two interests collide when a city undertakes to pass zoning laws regulating so-called "adult entertainment businesses": (1) individuals' right to receive, and owners' right to convey, nonobscene communication protected by the state and federal Constitutions, and (2) the city's interest in eradicating urban blight. Among the more serious perceived negative secondary effects of such entertainment businesses are increased crime, particularly prostitution, deteriorating neighborhoods, and economic injury to nearby businesses. (See generally, *Developments in the Law—Zoning* (1978) 91 Harv.L.Rev. 1427, 1551 (hereafter *Zoning*).) No one can doubt that these serious problems are a legitimate subject of local government concern. Many cities across the nation are expending considerable resources to rejuvenate long-neglected downtown areas. These efforts take a variety of forms: some cities pass zoning laws that disperse regulated uses throughout the locality; other zoning laws are aimed at clustering the uses in limited areas; some cities regulate the operating hours and storefront advertising of so-called adult-oriented businesses; still others rely on public nuisance laws. The Supreme Court has repeatedly emphasized that courts must allow cities " 'a reasonable opportunity to experiment with solutions to [these] admittedly serious problems.' " (*Renton, supra*, 475 U.S. at p. 52 [89 L.Ed.2d at p.

41], quoting *Young, supra*, 427 U.S. at p. 71 [49 L.Ed.2d at p. 327] (plur. opn.).)

But courts must also protect individuals' rights to freedom of speech, the cornerstone of a democratic society. The federal Constitution guarantees that "Congress shall make no law . . . abridging the freedom of speech . . . ." (U.S. Const., 1st Amend.) The California Constitution declares the same right in the affirmative: "Every person may freely speak, write and publish his or her sentiments on all subjects . . . ." (Cal. Const., art. I, § 2, subd. (a).) That the communication involved here pertains to sex does not mean that it deserves less than full constitutional protection.[1] "[S]ex and obscenity are not synonymous. . . . The portrayal of sex, e.g., in art, litera-ture and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital prob-lems of human interest and public concern." (*Roth* v. *United States* (1957) 354 U.S. 476, 487 [1 L.Ed.2d 1498, 1508, 77 S.Ct. 1304], fn. omitted.) These words, although written over three decades ago, still have relevance today, although to the examples must be added stage and screen presentations.

Neither of the conflicting interests, the Supreme Court has explained, is absolute. A city may, under certain circumstances, pass zoning regulations that impair the First Amendment rights of theater owners and their cus-tomers. In the seminal *Young* case, *supra*, 427 U.S. 50, a sharply divided court upheld a Detroit ordinance that prohibited adult theaters from locat-ing within 1,000 feet of any 2 other "regulated uses," such as motels, liquor stores and adult bookstores, or within 500 feet of a residential area. Prelimi-narily, the court refused to consider a vagueness challenge to the ordi-nance's definition of adult motion picture: the plaintiff theater owners lacked standing to raise the challenge because they plainly intended to exhibit the type of motion pictures clearly covered by the definition, i.e.,

---

[1] Some commentators argue that constitutional protection should be afforded only to ex-plicitly political speech, and not to scientific or literary speech. (See, e.g., Bork, *Neutral Prin-ciples and Some First Amendment Problems* (1971) 47 Ind.L.J. 1.) Justice Stevens, writing for the plurality in *Young,* suggested that "erotic materials" were not entitled to the same mea-sure of constitutional protection as "political debate." (427 U.S. at pp. 61, 70 [49 L.Ed.2d at pp. 320-321, 326].) Fortunately, these views have not prevailed. (Nimmer on Freedom of Speech (1984) § 3.01.) A majority of justices in *Young* concluded that nonobscene erotic ma-terials may not be treated differently under First Amendment principles from other forms of protected expression. (427 U.S. at p. 73, fn. 1 [49 L.Ed.2d at pp. 327-328] (Powell, J., concur-ring), pp. 85-87 [49 L.Ed.2d at pp. 335-336] (Stewart, J., dissenting, joined by Brennan, Mar-shall and Blackmun, JJ.).) This latter position is consonant with the state constitutional dic-tate that persons may speak freely "on all subjects." (Cal. Const., art. I, § 2, subd. (a).) The Oregon Supreme Court reached the same conclusion in its colorful opinion in *State* v. *Henry* (1987) 302 Ore. 510, 525 [732 P.2d 9, 17-18].

"distinguished or characterized by an emphasis on" certain listed sexual activities or anatomical areas. (*Id*. at p. 59, fn. 16 [49 L.Ed.2d at p. 319].)

Turning to the merits, the court relied on three factors in rejecting the plaintiffs' equal protection challenge. One, the ordinance did not greatly restrict access to "lawful speech." (*Young, supra*, 427 U.S. at p. 71, fn. 35 [49 L.Ed.2d at p. 327] (plur. opn.), pp. 77, 79 [49 L.Ed.2d at pp. 330-331] (conc. opn. of Powell, J.).) Two, the intent of the city in passing the ordinance was to ameliorate the negative secondary effects of adult entertainment businesses, not to suppress "offensive" speech. (*Id*. at p. 71, fn. 34 [49 L.Ed.2d at p. 326] (plur. opn.), pp. 80-81 [49 L.Ed.2d at pp. 331-332] (conc. opn. of Powell, J.).) Three, the record disclosed a factual basis for the city's conclusion that the type of restriction it imposed would have the desired effect. (*Id*. at p. 71 [49 L.Ed.2d at p. 326] (plur. opn.), p. 82 [49 L.Ed.2d at p. 333] (conc. opn. of Powell, J.).)

In dictum, a majority of this court now create a new standard that does violence to both free speech principles and cities' interest in tailoring zoning regulations to local circumstances. If the "regular and substantial course of conduct" standard were adopted by a legislative body in the same unstudied manner as it is suggested by the majority, courts would be required to strike it down because it fails to meet the *Young* criteria. Because the case comes to us on demurrer there is no evidence in the record that the new standard would allow substantially unimpeded access to protected speech. Moreover, there is absolutely no factual basis for the majority's surmise that a "regular and substantial course of conduct" standard will substantially assist Long Beach or any other city to fight urban blight.

In most cases, courts are not required to examine the legislative record or to inquire into legislators' motives when reviewing a statute or ordinance. When the legislation impairs the right to freedom of speech, however, "courts should continue to undertake more than a cursory, deferential examination of the factual bases of the municipality's decision. Courts sensitive to the first amendment issues at stake should insist upon a fairly complete record of the evidence available to municipal legislators at the time they acted and of the facts on which they relied . . . ." (*Zoning, op. cit. supra*, 91 Harv.L.Rev. at p. 1559; see also *Schad* v. *Mount Ephraim* (1981) 452 U.S. 61, 69-70 [68 L.Ed.2d 671, 681, 101 S.Ct. 2176].) In *Christy* v. *City of Ann Arbor* (6th Cir. 1987) 824 F.2d 489, certiorari denied (1988) 484 U.S. 1059 [98 L.Ed.2d 978, 108 S.Ct. 1013], the court examined an ordinance that defined an adult bookstore as an establishment having as a "principal activity" the sale of books or films characterized by an emphasis on certain enumerated sexual activities. "Principal activity" was in turn defined as a "use accounting for more than 20 per cent of a business." The court of

appeals vacated the district court's order denying the plaintiff bookseller's motion for preliminary injunction and remanded the case for further proceedings.

After carefully examining the record, the court of appeals held, "Although both the Supreme Court in *Renton,* 106 S.Ct. at 931, and the Sixth Circuit in *CLR* [*Corp.*] v. *Henline* [(6th Cir. 1983)] 702 F.2d [637] at 639, have stated that a city need not conduct new independent studies to justify adult business zoning ordinances, both courts have required *some relevant evidence* to demonstrate that the zoning ordinance was intended to address the secondary effects of adult businesses. The burden of proof is on the city to show that more than a rational relationship exists between the ordinance and this government interest. [Citation.] In the case at hand, the district court's opinion notes only that the city 'has asserted that its purpose in passing this ordinance is to prevent the concentration of adult businesses and resultant urban blight.' [Citation.] Upon careful review of the record in this case, we find no such 'assertion,' nor do we find *any evidence* of a legitimate government objective for the passage of this zoning ordinance." (*Christy* v. *City of Ann Arbor, supra*, 824 F.2d at p. 493, italics added.)

If a legislative body is constitutionally prohibited from zoning adult entertainment businesses absent findings that the ordinance is directed to ameliorating secondary effects, then a fortiori this court may not "legislate" a new standard absent a record from which it can be fairly inferred that such a standard will substantially serve the government objective.

The majority's incursion into the legislative realm is as unnecessary as it is mischievous. The majority complain that "[t]he exact basis of the *Pringle* decision is not entirely clear" while suggesting that it sets a constitutionally based regulatory floor for all localities in the state, i.e., that no city may constitutionally define an adult motion picture theater as a building used to exhibit anything less than 50 percent adult films, no matter what evidence is presented to the legislative body. (Maj. opn., *ante,* at p. 26, fn. 8 and p. 28, fn. 10.) To the contrary, *Pringle, supra,* 115 Cal.App.3d 151, did not purport to hold that its preponderance standard represented any sort of constitutional floor for adult entertainment zoning ordinances in general or that a local entity was precluded from adopting any definition of an adult theater that was more restrictive than the preponderance standard.

Indeed, two Court of Appeal decisions cited by the majority make this point very clear. In *Kuhns* v. *Board of Supervisors* (1982) 128 Cal.App.3d 369 [181 Cal.Rptr. 1], decided just one year after *Pringle,* the Court of Appeal applied the predominance standard in defining the proportion of a bookstore's stock that would render the store an "adult bookstore" for

purposes of a similar zoning ordinance, but at the same time explicitly recognized that a local legislative body retained the authority to adopt an alternative standard, stating: "If the board of supervisors intended to allow a lesser portion it behooves them to quantify the phrase and make findings showing their figure is consonant with the governmental interest being protected." (128 Cal.App.3d at p. 376.) And in *Strand Property Corp.* v. *Municipal Court* (1983) 148 Cal.App.3d 882 [200 Cal.Rptr. 47], the Court of Appeal, while applying the *Pringle* standard to the version of a San Diego adult entertainment zoning ordinance before it, noted that the city council had amended the ordinance after the suit in that case had been filed to define an adult motion picture theater as a theater that presents sexually explicit films or shows "for viewing on more than 7 days within any 56-consecutive-day period," and stated approvingly that while "this provision is not in issue here, . . . we may observe it operates in aid of the Code's certainty." (148 Cal.App.3d at p. 889, fn. 9.)

Thus, *Pringle, supra,* 115 Cal.App.3d 151, should not be, nor has it been, interpreted as preventing a city from holding public hearings and examining studies, based either on its own or other cities' experiences, and enacting an ordinance that explicitly defines adult motion picture theaters as those exhibiting numerically more or less than a preponderance of adult films. At that point, a city may be in the correct posture to raise the claims Long Beach attempts to litigate in this case.

That the majority's "regular and substantial course of conduct" standard is vague and untailored to the governmental interest at stake is hardly surprising. It does not appear in the parties' briefs, in decisions of the courts below, or indeed, in any of the reported cases in this state. While we cannot insist on "celestial precision," as the majority put it, because the ordinance touches on free speech rights and because violation of the ordinance can subject a theater owner to criminal penalties, both the locality's interests and constitutional values would be better served by a more precise definition of "adult motion picture theater"—(see, e.g., *Strand Property Corp.* v. *Municipal Court, supra,* 148 Cal.App.3d 882, 889)—that is, a definition that can be understood and easily applied by all parties without engendering endless court controversy and without deterring constitutionally protected speech that poses no substantial danger of adverse secondary effects. The choice among a variety of reasonable, alternative standards that could be used to define an "adult motion picture theater" is clearly a legislative policy decision. The appropriate legislative body, not this court, is in the best position to assess the circumstances likely to create adverse secondary effects in its own community.

## III

I must acknowledge that I share the majority's concern that the preponderance test *might* result in too high a standard. The solution, however, is not to invent a "regular and substantial course of conduct" standard, of dubious context and unsupported by legislative findings. To do so is to usurp the legislative role. In my view the proper course is to allow municipalities, which "often employ planning experts who can prepare studies of the probable effects of a proposed zoning ordinance" (*Zoning, op. cit. supra,* 91 Harv.L.Rev. at p. 1560), to analyze, to consider and possibly to experiment with various standards and, most importantly, to create a record for judicial review. If an ordinance based on such a record is thereafter challenged, we would have a sound basis for determining whether the standard violates free speech principles.[2]

**KENNARD, J.,** Concurring and Dissenting.—

## I.

I concur in the majority's conclusion that the Long Beach adult entertainment zoning ordinance at issue here cannot properly be interpreted to classify a theater as an "adult motion picture theater" within the meaning of the ordinance (Long Beach Mun. Code, § 21.51.020 A.2)[1] solely on the basis of the theater's single showing of a sexually explicit film. This conclusion would follow even under ordinary principles of statutory interpretation, without resort to constitutional considerations.

The ordinance in question is a zoning ordinance, not an obscenity ordinance. As the United States Supreme Court said in *Renton* v. *Playtime Theaters, Inc.* (1986) 475 U.S. 41, 47 [89 L.Ed.2d 29, 37, 106 S.Ct. 925], such an ordinance "is aimed not at the *content* of the films shown at 'adult motion picture theaters,' but rather at the *secondary effects* of such theaters on the surrounding community." (Italics in original.)

---

[2] It appears that the majority do not propose that their new standard should be applied retroactively to these defendants (see maj. opn., *ante,* at p. 28, fn. 11). Criminal prosecution based on the past conduct of defendants—like the theater owners in this case—who may well have conducted their theater's operations in reliance both on the *Pringle* decision and on subsequent California cases that followed *Pringle,* would undoubtedly raise serious ex post facto problems.

[1] Section 21.51.020 provides in relevant part: "A. For purposes of this chapter, the adult entertainment businesses are defined as follows:

" . . . . . . . . . . . . . . . . .

"2. 'Adult motion picture theater' means an enclosed building with a capacity of fifty or more persons used for presenting material distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas for observation by patrons therein."

"[It] is difficult to imagine that only a single showing ever, or only one in a year, would have any meaningful secondary effects" on the community surrounding a motion picture theater. (*Tollis, Inc.* v. *San Bernardino County* (9th Cir. 1987) 827 F.2d 1329, 1333.) Therefore, it would not be reasonable to ascribe to the drafters of the Long Beach ordinance an intent to include a theater within the ordinance's "adult motion picture theater" category on the basis of a single showing of a sexually explicit film, particularly in the absence of any indication on the face of the ordinance or any legislative history suggesting such an intent. Thus, I concur in the majority's rejection of the city's contention that the ordinance embodies a "single use" standard.

## II.

Like Justice Mosk, however, I cannot join in that portion of the majority opinion which goes beyond the city's "single use" contention and undertakes to fashion an entirely new standard for defining an "adult motion picture theater" for purposes of the Long Beach ordinance. In so doing, the majority discards the Court of Appeal's interpretation of a virtually identical provision in *Pringle* v. *City of Covina* (1981) 115 Cal.App.3d 151 [171 Cal.Rptr. 251]. This venture by the majority is, in my view, unwarranted.

In *Pringle,* the appellate court construed the challenged adult entertainment zoning ordinance as applying only to theaters which showed "a preponderance" of sexually explicit films. Other appellate courts have followed *Pringle* in interpreting similar zoning ordinances which did not contain a precise or definite standard for determining whether a theater or bookstore fell within the reach of the ordinance. (See, e.g., *Kuhns* v. *Board of Supervisors* (1982) 128 Cal.App.3d 369, 376 [181 Cal.Rptr. 1]; *Strand Property Corp.* v. *Municipal Court* (1983) 148 Cal.App.3d 882, 889-890 [200 Cal.Rptr. 47].)

During oral argument in this case, counsel for the city was asked several times whether, in the event the court disagreed with his "single use" contention, he was urging the court to interpret the ordinance as embodying some form of intermediate standard between a "single use" standard and *Pringle*'s "preponderance" standard. Counsel responded he was going "for broke," and he did in fact argue only for a "single use" standard. Under these circumstances, we should not devise a compromise interpretation of our own design.

Also, in reaching out to overturn *Pringle, supra,* 115 Cal.App.3d 151, the majority opinion ignores the fact that, in the span of eight years since that decision, the City of Long Beach has taken no action to modify the *Pringle*

test. If, in the city's view, the "preponderance" standard is too easily evaded and does not adequately identify those theaters which produce detrimental secondary effects on the surrounding neighborhoods in its community, the city could have amended the language of its zoning ordinance to adopt an alternative, more stringent definition of adult theaters.[2] Both *Kuhns* and *Strand,* which were decided in 1982 and 1983, hold that a locality is free to adopt an alternative to the preponderance standard. (See *Kuhns, supra,* 128 Cal.App.3d at p. 376; *Strand, supra,* 148 Cal.App.3d at p. 889.) Indeed, the *Strand* decision specifically noted that the City of San Diego had opted for this approach in September of 1982, when it amended its adult entertainment zoning ordinance to specifically define an adult theater as one which exhibits the described type of sexually explicit films " 'on more than 7 days within any 56-consecutive-day period.' " (See *Strand, supra,* 148 Cal.App.3d at p. 889, fn. 9.)

Here, in discarding *Pringle*'s "preponderance" standard, the majority opinion fails to give adequate deference to the city's legislative prerogative.

Finally, there is an additional reason why we should leave to the city's legislative body the task of modifying the *Pringle* test. Under the somewhat indefinite "regular and substantial course of conduct" standard proposed by the majority, an ordinary theater (see, e.g., *Pringle, supra,* 115 Cal.App.3d at p. 153 & fn. 1), which in good faith wishes to comply with the law, may have difficulty in determining whether it may show a popular, nonobscene—but sexually explicit—film once a week, once a month, or even once every two months without facing criminal charges of having turned its theater into a prohibited "adult motion picture theater." Even if the majority's proposed standard is sufficiently definite to survive a constitutional vagueness challenge—a question on which I would reserve judgment—it still appears unwise to thrust such a standard on a locality which has not itself opted for such an opaque definition. As Justice Mosk observes, such a standard will inevitably engender "endless court controversy" (see *ante,* p. 33) as to how many films must be shown over what period of time to satisfy the "regular and substantial course of conduct" test. Such litigation would ill-serve not only the administrative and financial interests of the locality

---

[2] Contrary to the implication in the majority opinion (see *ante,* p. 26 & fn. 8), there is nothing in *Pringle* which suggests that its "preponderance" standard represented any sort of constitutional "floor" for adult entertainment zoning ordinances in general. Although the *Pringle* court did hold that the term "used" in the ordinance at issue in that case could not constitutionally be interpreted to mean a "single use" (*Pringle, supra,* 115 Cal.App.3d at pp. 161-162), the court did not in any way intimate that local entities were constitutionally prohibited from adopting any definition of an adult theater that was more restrictive than a preponderance standard. And, as noted hereafter in the body of my concurring and dissenting opinion, other courts have not interpreted *Pringle* as adopting such a restriction.

but also the legitimate constitutional interests of theater owners and theater patrons.

There are numerous methods by which a city could reasonably define the category of theaters whose presence is likely to have detrimental secondary effects on the surrounding community without creating the enforcement problems which are likely to arise under the majority's view. For instance, a city could define such a theater by reference to (1) the proportion of the theater's films which are sexually explicit, (2) the number of sexually explicit films which are shown at the theater each week, each weekend or each month, (3) the nature of the films which receive top billing on the theater's marquee or in its advertisements, or (4) the percentage of the theater's revenues which are attributable to the showing of sexually explicit films.

A local legislative body is better equipped than this court to determine, in light of local conditions, how best to identify those theaters which are likely to become a "blight" on the local community, and to frame a definition which local authorities can enforce and which will provide adequate guidance to those who wish to comply with the law.[3]

Accordingly, although I concur in the majority's rejection of the city's "single use" contention and in the affirmance of the Court of Appeal judgment, I respectfully dissent from the majority opinion insofar as it ventures beyond the city's "single use" claim.

Broussard, J., concurred.

The petition of real parties in interest for a rehearing was denied August 24, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

[3] Unlike Justice Mosk, I do not read the governing federal decisions as requiring a local entity to point to specific empirical evidence to support its choice of one particular definition of "adult theater" over another. The lead opinion in *Young* v. *American Mini Theatres* (1976) 427 U.S. 50, 71 [49 L.Ed.2d 310, 327, 96 S.Ct. 2440], makes it clear that a city "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." Of course, any definition which is chosen must not be " 'a pretext for suppressing expression' " (see *Renton, supra,* 475 U.S. at p. 54 [89 L.Ed.2d at p. 42] [quoting *Young, supra,* 427 U.S. at p. 84 [49 L.Ed.2d at p. 334] (Powell, J. conc.)]), but must be selected as a reasonable means of protecting the community from adverse secondary effects.

APPENDIX

LONG BEACH MUNICIPAL CODE

CHAPTER 21.51

SECTION 21.51.010 PURPOSE.

The city council finds that adult entertainment businesses, because of their very nature, are recognized as having objectionable operational characteristics, particularly when several of them are concentrated under certain circumstances, thereby having a deleterious effect upon the adjacent areas. Special locational regulation of these businesses is necessary to insure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhoods. The primary purpose of the regulation is to prevent the concentration or clustering of these businesses in any one area. This chapter shall be deemed a reenactment of the preexisting ordinance on this subject matter. (Ord. C-5487 § 1(part), 1979; prior code § 9120.17(a)).

SECTION 21.51.020 DEFINITIONS

A. For purposes of this chapter, the adult entertainment businesses are defined as follows:

. . . . . . . .

2. "Adult motion picture theater" means an enclosed building with a capacity of fifty or more persons used for presenting material distinguished or characterized by their emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas for observation by patrons therein.

. . . . . . . .

B. For purposes of this chapter, "specified sexual activities" shall include the following:

1. Actual or simulated sexual intercourse, oral copulation, anal intercourse, oral anal copulation, bestiality, direct physical stimulation of unclothed genitals, flagellation or torture in the context of sexual relationship, or the use of excretory functions in the context of a sexual relationship, and any of the following depicted sexually oriented acts or conduct: analingus, buggery, coprophagy, coprophilia, cunnilingus, fellatio, necrophilia, pederasty, pedophilia, piquerism, sapphism, zooerasty; or

2. Clearly depicted human genitals in a state of sexual stimulation, arousal or tumescence; or

3. Use of human or animal masturbation, sodomy, oral copulation, coitus, ejaculation; or

4. Fondling or touching of nude human genitals, pubic region, buttocks or female breast; or

5. Masochism, erotic or sexually oriented torture, beating or the infliction of pain; or

6. Erotic or lewd touching, fondling or other contact with an animal by a human being; or

7. Human excretion, urination, menstruation, vaginal or anal irrigation.

C. For purposes of this chapter, "specified anatomical areas" shall include the following:

1. Less than completely and opaquely covered human genitals, pubic region, buttock, and female breast below a point immediately above the top of the areola; and

2. Human male genitals in a discernibly turgid state, even if completely and opaquely covered. (Ord. C-5497 § 1 (part), 1979; prior code § 9120.17(b)).

SECTION 21.51.030 LOCATION RESTRICTED.

A. In those land use districts where the adult entertainment businesses regulated by this chapter would otherwise be permitted uses, it shall be unlawful to establish any such adult entertainment business if the location is:

1. Within five hundred feet of any area zoned for residential use;

2. Within one thousand feet of any other adult entertainment business; or

3. Within one thousand feet of any public or private school, park, playground, public building, church, any noncommercial establishment operated by a bona fide religious organization, or any establishment likely to be used by minors.

B. The establishment of any adult entertainment business shall include the opening of such a business as a new business, the relocation of the business, or the conversion of an existing business location to any adult entertainment business use. (Ord. C-5487 § 1 (part), 1979; prior code § 9120.17(c)).

SECTION 21.51.040 VARIANCE.

A. Any property owner or his authorized agent may apply for relief from the locational provisions of this chapter by applying for a standards variance as provided in this title. To grant such a request the following additional findings must be made:

1. That the proposed use will not be contrary to the public interest or injurious to nearby properties and that the spirit and intent of this chapter will be observed;

2. That the proposed use will not enlarge or encourage the development of a skid row area;

3. That the establishment of an additional regulated use in the area will not be contrary to any program of neighborhood conservation nor will it interfere with any program of urban renewal; and

4. That all applicable regulations of the municipal code will be observed.

B. The procedure for this hearing shall be the same as that provided for a standards variance in this title. (Ord. C-5487 § 1 (part), 1979; prior code § 9120.17(d)).