Robert J. ABBOTT, Plaintiff,

v.

CITY OF CAPE CANAVERAL & Code
Enforcement Board of the City of
Cape Canaveral, Defendants.

No. 92–1113–CIV–ORL–18.

United States District Court,
M.D. Florida,
Orlando Division.

Jan. 5, 1994.

Robert Kimbark Lee, Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Orlando, FL, for plaintiff.

Michael J. Roper, Dean, Ringers, Morgan and Lawton, P.A., Orlando, FL, for defendants.

## ORDER

G. KENDALL SHARP, District Judge.

Robert J. Abbott (Abbott) brings this action against the City of Cape Canaveral (Cape Canaveral) and the Code Enforcement Board of the City of Cape Canaveral (Board) claiming Federal Communications Commission (FCC) Preemption and alleging violations of the First and Fourteenth Amendments, due process, equal protection, and 42 U.S.C. §§ 1983 and 1988. This case was tried without a jury. The issues before the court are whether 47 CFR § 25.104 preempts section 641.61 of Cape Canaveral's zoning ordinance and whether the local ordinance violates Abbott's constitutional rights under the First Amendment and to due process and equal protection. The court concludes that 47 CFR § 25.104 does not preempt section 641.61 of Cape Canaveral's zoning ordinance. The court further finds that neither Cape Canaveral nor the Board violated Abbott's constitutional rights. In accordance with Federal Rule of Civil Procedure 52(a), the court enters this order.

### I. Findings of Fact

#### A. Installation of Abbott's Satellite Dish Antenna

Abbott, a NASA aerospace engineer, owns and occupies a residence located 414 Jackson Avenue, Cape Canaveral, Florida. Abbott initially moved to Cape Canaveral in 1981. In 1984, Abbott purchased and installed a satellite television "receive only" dish antenna at his Cape Canaveral residence. Abbott paid $1254.95 for the satellite system which consisted of a twelve foot satellite dish, low noise amplifier, satellite receiver, and polarizer. The satellite dish was mounted on the west side of Abbott's residence on a three inch pipe anchored to a concrete filled block wall at a height of approximately twenty-one feet. (Doc. 37, ¶¶ 7, 8.) The satellite dish has a horizon to horizon mount. Abbott's residence is located in a district zoned medium density residential (R–2). At the time Abbott installed the satellite dish, Cape Canaveral did not have an ordinance restricting or regulating the installation of satellite dish antennas in the zoning district where Abbott lives.

In 1985, Abbott moved to California. During the time that Abbott lived in California, Abbott retained his Cape Canaveral residence. In 1987, Abbott took down the satellite dish at his Cape Canaveral residence and placed it in storage. In 1990, Abbott purchased a communications receiver, which cost $895.00. Abbott initially returned to Cape Canaveral in March 1992 and permanently returned to Cape Canaveral in April 1992.

#### B. Regulation of Satellite Dishes

While Abbott was living in California, Cape Canaveral enacted an ordinance pertaining to satellite dishes. The local ordinance at issue, section 641.61, provides in pertinent part:

A. No owner, occupant or tenant of any property located within any zoning classification shall erect, construct or install any earth station antenna or satellite dish antenna without first obtaining all necessary permits from the Building Official.

. . . .

D. No earth station antenna shall be mounted onto the top or side of any single family building, duplex or triplex.

. . . .

G. In all zones, ground mounted earth station antennas shall be erected at the minimum height which allows satellite reception, not to exceed seven (7) feet in R–1 and R–2 zones, and twenty-two (22) feet in all other zones. Said measurement shall be calculated from the established grade to the dish center.

Abbott testified that in or about March 1992, after he learned that Cape Canaveral had enacted the ordinance pertaining to satellite dishes, Abbott met with the City Building Official, James E. Morgan (Morgan), and advised Morgan that he intended to reinstall the satellite dish at the same location where the satellite dish was previously mounted. Abbott testified that he thought his use of the satellite dish was "grandfathered in" with the new ordinance. According to Abbott, approximately one month later, Morgan told Abbott that Abbott could reinstall the satellite dish. After Abbott reinstalled the satellite dish, Cape Canaveral Code Enforcement Officer Thomas B. Kleving (Kleving) issued Abbott a notice dated July 1, 1992 which directed Abbott to stop installation of the satellite dish antenna located at Abbott's residence until such time as Abbott complied with Cape Canaveral's building regulations. (Pl.'s Ex. 6.) Abbott testified that after he received the stop notice, he spoke with both Morgan and Kleving regarding the matter and Abbott's contention that Morgan had advised Abbott that Abbott could install the satellite dish on top of Abbott's house. However, Morgan testified that there was a misunderstanding between Abbott and himself regarding the grandfathering status of Abbott's use of the satellite dish because Morgan was unaware that the satellite dish had been removed for over four years.

Subsequently, Kleving issued Abbott a Notice of Ordinance/Code Violation which informed Abbott that he was in violation of Cape Canaveral's Earth Station Antenna Regulations, in particular, section 641.61(A), (D), and (G). (Pl.'s Ex. 7.) The notice required Abbott to take corrective action to remedy the violation by August 13, 1992. The notice further provided that if the violation continued beyond the correction date or reoccurred, the Code Inspector would notify the Board and request a hearing. Abbott initially appeared before the Board on August 20, 1992. However, the Board continued the matter until the scheduled September meeting. The September meeting resulted in the Board finding that Abbott had violated section 641.61, paragraphs (A), (D), and (G) of Cape Canaveral's zoning regulations. (Pl.'s Ex. 13.) Further, the Board

ordered Abbott to comply with section 641.61 on or before October 20, 1992, by detaching his antenna from his residence and reinstalling the antenna to conform with Cape Canaveral's regulations. (Pl.'s Ex. 13.) According to the Board's Compliance Order, if Abbott did not comply with the Order or if the violation reoccurred Abbott would incur fines. (Pl.'s Ex. 13.)

In a letter dated October 8, 1992, Abbott sought a waiver of fines while he pursued his legal remedies. (Pl.'s Ex. 14.) On October 22, 1992, the Board denied Abbott's request for a waiver of fines. On October 23, 1992, Abbott removed his satellite dish from the mount on the side of his residence. In December 1992, Abbott filed this suit. Abbott did not seek a variance at any time.

Abbott maintains that the costs associated with compliance with the local ordinance include approximately $400.00 for fencing, $400.00 for reinstallation of pole and concrete foundation, $400.00 for engineer approved drawings, and $200.00 for electrical installation.

## C. Range of Channels and Programming Available

Abbott testified at trial that he purchased the satellite dish because of the magnitude of channels and variety of programming available through satellite systems as compared to the range of channels and programming local television stations and cable companies provide. Abbott stated that he is interested in receiving programming such as United States Information Agency, PBS, and other educational programs as well as programming related to socio-political issues. In addition, Abbott seeks to receive NASA science and technology programs. According to Abbott, the types of programming Abbott received in 1984 included PBS, sports, news uplink broadcast, and foreign language broadcasts from Canada and Mexico.

Abbott's expert at trial, Richard W. Towers (Towers), testified that he tested four locations on Abbott's property to determine whether Abbott could install his satellite dish in compliance with the local ordinance and obtain all the satellites Abbott desired. Tow-

ers testified that no place exists on Abbott's property in which to install the satellite dish to enable Abbott to receive all the satellites available to him without violating the local ordinance. According to Towers, four of the Western or North American satellites are partially obstructed and the Eastern satellites are completely obstructed.

Towers testified that approximately 75 satellites are viewable from Cape Canaveral. According to Towers, the North American satellites are generally located on an arc between 149 degrees west and 41 degrees west and consist of United States satellites as well as five international satellites. Towers stated that the international satellites are not intended for the continental United States but that the United States receives transmissions from these satellites. Towers also testified that some satellites in the middle of range 9 degrees west and 41 degrees west are intended for the United States.

Towers admitted on cross-examination that the North American satellites generally fall within the range 137 degrees west and 69 degrees west, however, Towers maintained that some of the North American satellites are beyond 69 degrees west. Further, Towers' testimony shows that although Towers thought there was some obstruction of the satellite Satcom 2, he could not quantify any obstruction; that at the time of his deposition he stated that Satcom 2 was unobstructed; that in the range between 137 degrees west and 69 degrees west, only two satellites had any obstruction; that the satellite TDRS located at 149.8 degrees west is not a commercial satellite but instead a government satellite; and that the satellite Aurora 2 located at 139 degrees west serves mostly Alaska and Hawaii and is not intended for viewing in the southern United States. According to Towers, approximately 230 channels are available to Abbott unobstructed with the satellite dish located on the ground. As to particular programs Abbott seeks to view, Towers testified that SCOLA, CNN, and PBS are available on satellites which Abbott receives unobstructed.

Cape Canaveral and the Board presented the testimony of Thomas J. Ferrari (Ferrari) as an expert on their behalf. According to Ferrari, the satellites generally considered available to North American audiences are satellites located within the range 137 degrees west through 69 degrees west and are commonly referred to as the North American satellites.

Ferrari testified that he conducted a site survey of Abbott's residence to determine whether Abbott's satellite antenna could receive all the intended satellites with the satellite dish placed on the ground. In conducting the site survey, Ferrari used a site survey tool, which Ferrari described as a combination compass and viewfinder to determine whether there were any obstructions to satellites on Abbott's property. Ferrari testified that he surveyed three locations within Abbott's property and found that the optimal placement for the satellite dish was the second location tested in Abbott's west yard. Ferrari testified that according to the results of his site survey, Abbott can receive all the satellites intended for North American audiences. Ferrari stated further that Abbott cannot receive the Eastern Satellites because these satellites are not intended for North American audiences.

Ferrari testified that the fence on the west side of Abbott's property did not cause much, if any, blockage of signals. Further, even assuming a partial blockage of two to three feet of the satellite dish, Ferrari testified that the blockage would effect the signal level only to a small degree and that any change in quality of the picture would not be visibly noticeable. According to Ferrari, a satellite dish does not need to be entirely unobstructed to receive quality reception. Ferrari testified that even assuming a 10 to 20 percent blockage of the satellite dish, no noticeable difference in quality of picture is visible to the naked eye. According to Ferrari, partial blockage of a satellite antenna does not affect the quality of the picture visible to a customer because a parabolic antenna receives signals from all over the dish which reflect to the centerpoint where the feed horn is located. Thus, even if a satellite dish is partially blocked, a significant area of the satellite dish collects enough signals to generate a good picture.

Ferrari testified that Abbott would have approximately 250 channels available to him on C–Band within the range of satellites 137 degrees west and 69 degrees west. Ferrari testified that Abbott can receive CNN, PBS, and SCOLA with the satellite dish installed in the west yard as well as receive all channels that are received and then rebroadcast by local cable television companies.

## II. Conclusions of Law

### A. FCC Preemption

In 1986, the FCC promulgated a regulation which preempts local zoning ordinances that differentiate between satellite antenna facilities. This regulation provides, in pertinent part:

> State and local zoning or other regulations that differentiate between satellite receive-only antennas and other types of antenna facilities are preempted unless such regulations:
>
> (a) Have a reasonable and clearly defined health, safety or aesthetic objective; and
>
> (b) Do not operate to impose unreasonable limitations on, or prevent, reception of satellite delivered signals by receive-only antennas or to impose costs on the users of such antennas that are excessive in light of the purchase and installation cost of the equipment.

47 CFR § 25.104 (1992).

The parties stipulated that section 641.61 of Cape Canaveral's zoning regulations applies only to satellite antennas and not to other types of antenna facilities which receive communications from earth-based transmitters, such as conventional television antennas or ham radio antennas. Thus, because the local ordinance differentiates between satellite receive-only antennas and other types of antennas, the local ordinance must satisfy both subsections of the FCC regulation to avoid preemption.

### 1. Reasonable and Clearly Defined Health, Safety, or Aesthetic Objective.

■ Abbott claims that local ordinance section 641.61 does not set forth a health, safety, or aesthetic objective, or in the alternative, that ordinance number 48–85 fails to justify a differentiation in treatment between receive-only satellite antennas and other antennas, and thus, the FCC regulation preempts the local ordinance. However, Cape Canaveral and the Board contend that because section 641.61 was enacted by ordinance number 48–85, the preamble of the enacting ordinance must be consulted in construing section 641.61.

Ordinance number 48–85 adopted section 639.61, entitled Earth Station Antenna Regulations. (Def.'s Ex. 2.) Ordinance number 48–85 contains a preamble which emphasizes Cape Canaveral's concern with public safety and community aesthetics in regulating the installation of satellite dish antennas. (Def.'s Ex. 2.) In particular, the preamble addresses the necessity of well-defined engineering installation and fencing around the base as safety measures. Further, the preamble stresses the difference in appearance between satellite dish antenna and dipole antenna as a basis for its aesthetic concerns. Although ordinance number 4–89 amended ordinance number 48–85, the amending ordinance merely renumbered section 639.61 to section 641.61. (Def.'s Ex. 3.) The amending ordinance did not alter any wording in the section. Thus, the court finds that because the preamble contains the required objectives, local ordinance 641.61 satisfies 47 CFR § 25.104(a). *See Cawley v. City of Port Jervis*, 753 F.Supp. 128, 131–32 (S.D.N.Y. 1990) (finding that health, safety or aesthetic objectives must be expressly articulated in the ordinance itself or in accompanying regulations); *cf. Van Meter v. Township of Maplewood*, 696 F.Supp. 1024, 1029 (D.N.J.1988) (finding that although ordinance did not explicitly state its purposes, the purposes were inferable from the ordinance). *But see Kessler v. Town of Niskayuna*, 774 F.Supp. 711, 715 (N.D.N.Y.1991) (stating that the FCC's clearly defined objective rule requires a local government to state why its ordinance differentiates between satellite dish antenna and other types of antenna); *Village of Elm Grove v. Py*, 724 F.Supp. 612, 614 (E.D.Wis. 1989) (same).

### 2. Unreasonable Limitations or Prevention of Reception of Satellite Signals.

■ Abbott contends that the local ordinance unreasonably limits or prevents recep-

tion of satellite signals transmitted by satellites. According to Abbott, the satellite dish must be installed on the top or side of his residence to obtain reasonable reception of satellite signals. Cape Canaveral and the Board argue that the local ordinance permits Abbott to receive all satellite transmissions from satellites which are intended for North American audiences. Moreover, Cape Canaveral and the Board maintain that the federal regulation contemplates that local ordinances may impose some interference as long as the ordinance does not restrict satellite reception to the degree that satellite telecommunications cannot compete with other modes of telecommunications.

Abbott seeks to receive reception of both the North American satellites and the Eastern satellites. Ferrari testified that the Eastern Satellites are not intended for North American audiences, and thus, not intended for Abbott. Further, both Ferrari and Towers testified that Abbott can receive satellites located within 137 degrees west through 69 degrees west, referred to as the North American satellites, without any significant interference. According to Ferrari, Abbott has minimal blockage, if any, and that such minimal blockage would not visibly affect the quality of picture received. Because Towers did not test the particular site which Ferrari contends Abbott can receive the North American satellites and because the City and the Board provided evidence that the Eastern Satellites are not intended for North American audiences, Abbott fails to show that the local ordinance unreasonably limits or prevents reception of satellite signals. *See Van Meter,* 696 F.Supp. at 1030 (stating that the FCC Order, 51 Fed.Reg. 5519 (1986), *et seq.,* does not require a local ordinance to permit optimal placement of a satellite dish, and that the Order precludes only unreasonable interference with satellite signal reception); *see also Elm Grove,* 724 F.Supp. at 617 (noting that the FCC's policy of developing a competitive marketplace does not necessarily entitle consumers to receive every available satellite channel). Accordingly, the court finds that the local ordinance satisfies the first prong of 47 CFR § 25.-104(b).

3. Imposition of Excessive Costs.

■ As to the imposition of costs, Abbott argues that the expenses necessary to comply with the local ordinance are excessive in light of the purchase and installation costs of Abbott's satellite dish. Specifically, Abbott testified that the costs to comply with the local ordinance approximate $1400.00. In his trial brief, Abbott calculated costs at approximately $1083.00. However, the trial brief submitted lists the following costs: $408.00 for a six foot fence; approximately $300.00 for a site plan and survey; $125.00 for engineering drawings; approximately $200.00 for electrical installation; and $50.00 for a building permit for the satellite dish. Cape Canaveral and the Board contend, however, that the costs associated in complying with section 641.61 are not unreasonable in light of Abbott's purchase and installation costs.

Towers and Ferrari do not dispute that the costs of $50.00 for a building permit and $75.00 to $150.00 for engineer approval of drawings and specifications are reasonable costs and that the cost for electrical installation is approximately $200.00. Further, Abbott admitted that he already has a fence at least six feet in height which is at least 80 percent opaque at its base. Thus, from the testimony provided at trial, the costs necessary to comply with the local ordinance are at most $400.00. Because Abbott's satellite system purchase and installation costs were $1254.95 in 1984 and $895.00 in 1985, the court finds that the costs necessary to comply with the local ordinance are not excessive in light of Abbott's purchase and installation costs. Accordingly, the local ordinance satisfies the requirements to avoid FCC preemption.

B. *Abbott's Constitutional Claims*

Abbott contends that section 641.61 violates his rights provided by the First and Fourteenth amendments, due process, and equal protection. In both Abbott's complaint and bench memorandum, Abbott referred only to substantive due process, and thus, Abbott does not raise a claim under procedural due process.

### 1. First Amendment.

Both parties agree that the local ordinance is content-neutral. (Doc. 61 at 16.) Courts will uphold a content-neutral ordinance which furthers a substantial governmental interest and does not unreasonably limit alternative avenues of communication. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986). As noted above, the local ordinance contains reasonable and clearly defined health, safety, and aesthetic objectives. *See supra* section II.A.1. Thus, the substantial governmental interest served through the ordinance is the health and safety of the people within the community and the aesthetic values of the community. *See Johnson v. City of Pleasanton,* 982 F.2d 350, 353 (9th Cir.1992) (recognizing public safety and aesthetic values as substantial governmental interests). Further, Abbott fails to show that the ordinance unreasonably limits alternative avenues of communication. Cape Canaveral and the Board presented evidence that Abbott can receive the satellites intended for Abbott's location. Additionally, evidence was presented that cable television is an option available to Abbott but that Abbott chooses not to subscribe to cable television. Further, Abbott testified that he has a regular dipole television antenna installed. Although the First Amendment may protect the right to receive suitable access to television broadcasts, the First Amendment does not afford Abbott an absolute right to receive every satellite signal which Abbott seeks, particularly in light of a legitimate time, place, and manner restriction. *See Red Lion Broadcasting Co., Inc. v. F.C.C.,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) (stating that "[i]t is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences...."); *see also Johnson,* 982 F.2d at 353 (stating that "*Red Lion* does not stand for an absolute right to receive the maximum amount of programming feasibly accessible via satellite."); *Decker v. City of Plantation,* 706 F.Supp. 851, 854 (S.D.Fla. 1989) (noting that the First Amendment right to receive information through a satellite dish is a relative right which may be outweighed by important governmental inter-

ests, such as protection of community aesthetics). Accordingly, the court finds that the local ordinance does not violate Abbott's First Amendment rights.

### 2. Substantive Due Process and Equal Protection.

Abbott claims that the local ordinance arbitrarily, capriciously, and without rational basis, deprives Abbott of a fundamental right to receive suitable access to satellite television programming. (Doc. 61 at 18.) However, as noted above, the right to receive television programming through a satellite dish is not absolute. *See Decker,* 706 F.Supp. at 854; *see also Johnson v. City of Pleasanton,* 781 F.Supp. 632, 640 (N.D.Cal.1991) (noting that plaintiffs did not have a First Amendment right of access to the television programming of their choice), *aff'd in part, rev'd in part on other grounds,* 982 F.2d 350 (9th Cir.1992). Abbott concedes that he does not have an absolute right to any and all programming of his choice. (Doc. 61 at 18.) Although Abbott claims that the ordinance is arbitrary and capricious and without any rational basis, Abbott fails to provide evidence in support of this assertion. Furthermore, as noted above, Abbott fails to show he is unable to receive satellite transmissions intended for his location. The court finds that the ordinance is rationally related to achieve the legitimate government objectives of health, safety and aesthetics, and thus, the ordinance does not violate substantive due process.

As to Abbott's equal protection claim, Abbott argues that the ordinance, as applied to him, violates his fundamental First Amendment rights. The parties stipulated that section 641.61 applies only to satellite receive-only antennas and not to other types of antenna facilities, and thus, the local ordinance treats satellite antennas differently. Because the right to receive satellite television programming of one's choice is not a fundamental right, the proper standard of review is whether the ordinance is reasonably related to a legitimate state interest. *Johnson,* 781 F.Supp. at 640 (recognizing that access to television programming of one's choice is not a fundamental right and

therefore applying a lower standard of review.) Although Abbott recognizes that Cape Canaveral advances safety and aesthetics as its goals and argues that enforcement of the ordinance is reasonably related to these goals, Abbott claims that the ordinance is arbitrary, capricious and not rationally related to the goals of safety and aesthetics. The court finds, however, that health, safety, and aesthetics are clearly legitimate governmental interests, particularly because Cape Canaveral is in a hurricane sensitive area. Furthermore, the court finds that the local ordinance is reasonably related to these legitimate governmental interests, and thus, the ordinance does not violate the equal protection clause. Because Abbott fails to show a constitutional deprivation, Abbott has no § 1983 claim remaining. *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir.1990) (stating that to maintain an action under § 1983, a plaintiff must show a deprivation of rights, privileges or immunities secured by the Constitution or laws of the United States and that conduct complained of was committed under color of state law), *cert. denied,* —— U.S. ——, 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991).

### III.  Conclusion

Section 641.61 of the Cape Canaveral ordinance contains reasonable and clearly defined health, safety, and aesthetic objectives, does not impose unreasonable limitations or prevent reception of satellite signals, and does not impose excessive costs in light of the purchase and installation costs of Abbott's satellite system. Thus, 47 CFR § 25.-104 does not preempt section 641.61. Further, Abbott fails to show that the local ordinance violates his constitutional rights under the First Amendment, or to substantive due process and equal protection. Accordingly, the court rules in favor of Cape Canaveral and the Board.

It is **SO ORDERED.**

### APPENDIX A

City of Cape Canaveral, Florida

Zoning Regulations

Section 641.61

A.  No owner, occupant or tenant of any property located within any zoning classification shall erect, construct or install any earth station antenna or satellite dish antenna without first obtaining all necessary permits from the Building Official.

B.  Prior to the issuance of any permit for the erection, construction or installation of any earth satellite antenna, the Building Official shall require an approved design placement drawing and engineering specifications, signed and sealed by an engineer licensed in the State of Florida, to meet all City and State laws and ordinances.

C.  All materials that make up the installation of such antennas and supporting structures shall be of a non-corrosive material to prevent metal fatigue from maintenance neglect.

D.  No earth station antenna shall be mounted onto the top or side of any single family building, duplex or triplex.

E.  Earth station dish antennas shall be allowed only in the rear or side yard in all zoning districts. Placement shall not be allowed in the front yard of any lot or parcel in any zoning district. Compliance with the side setback is required. Rear setback should be complied with except when compliance prevents installation.

F.  All electrical installations for the purpose of erection of antennas shall be in accordance with the National Electrical Code and all applicable City ordinances.

G.  In all zones, ground mounted earth station antennas shall be erected at the minimum height which allows satellite reception, not to exceed seven (7) feet in R–1 and R–2 zones, and twenty-two (22) feet in all other zones. Said measurement shall be calculated from the established grade to the dish center.

H.  The maximum outside diameter allowed for a dish receiver is ten (10) feet.

I.  Only one (1) antenna shall be allowed on any lot or parcel of land.

J.  Any ground placed antenna drive mechanisms, less than six (6) feet high to its lowest point, shall be fenced or screened in by a six

(6) foot high fence at least eighty percent (80%) opaque at its base.